THE LESSEE OF HENRY BREWER, PLAINTIFF IN ERROR, *vs.* JACOB BLOUGHER AND DANIEL BLOUGHER, DEFENDANTS IN ERROR.

Construction of the act of the legislature of Maryland, passed December session, 1825, entitled, "An Act relating to Illegitimate Children," which provides that "the illegitimate child or children of any female, and the issue of any such child or children," are declared capable in law "to take and inherit both real and personal estate from their mother and from each other, and from the descendants of each other, as the case may be, in like manner as if born in lawful wedlock."

J. S., who had several children who were the children of an incestuous connection, conveyed a tract of land in the state of Maryland to one of those children. The grantee died intestate and without issue, seized in fee of the land. Two brothers and one sister of this incestuous intercourse survived him. Held, that under the act of Maryland, "relating to Illegitimate Children," they inherited the estate of their deceased brother.

It is undoubtedly the duty of the Court to ascertain the meaning of the legislature from the words used in the statute, and the subject matter to which it relates; and to restrain its operation within narrower limits than its words import, if the Court are satisfied that the literal meaning of its language would extend to cases which the legislature never designed to include in it. According to the principles of the common law, an illegitimate child is filius nullius, and can have no father known to the law: and when the legislature speaks in general terms of children of that description, without making any exceptions, the Court is bound to suppose they design to include the whole class.

AN action of ejectment was instituted by the plaintiff in error, a citizen of Pennsylvania, in the Circuit Court of the United States for the District of Maryland, for the recovery of a tract of land situated in Allegany county, in the state of Maryland, called "Part of Grassy Cabin."

The following were the facts of the case, as agreed upon by the parties to the suit.

John Sloan, late of Allegany county, was twice married; by his first wife he had but one child, namely, Mary Sloan; and by his second wife he had the following children, namely, William Sloan, John Sloan, Elizabeth Sloan, Peggy Sloan, Sally Sloan, and Jane Sloan: and that the plaintiff's lessor is the husband of the said Elizabeth.

After the death of his second wife, John Sloan lived and cohabited with and married Mary Sloan, his daughter, by his first wife, and had by her the following children, viz.: William Sloan, John Joseph Sloan, Mary Sloan, Jesse Sloan, and David Sloan; and William Sloan is since dead.

The said John Sloan, the father, was many years ago seized and possessed of a tract of land lying in Allegany county, Maryland, called "Grassy Cabin," containing four hundred twenty-seven and one-fourth acres, to which tract he had an undisputed legal title.

The said John Sloan being so seized and possessed of the said tract of land, conveyed the same for a valuable consideration, by a deed of bargain and sale, duly executed, acknowledged, and recorded according to law, to John Joseph Sloan, and that the said

[The Lessee of Brewer *vs.* Blougher.]

John Joseph Sloan became and was seized and possessed of the said tract of land, under and by virtue of the said deed.

The said John Sloan, the father, and Mary Sloan, his said daughter, by his first wife, both departed this life about the year 1826, and the said John Joseph Sloan died about the year 1832, seized and possessed of the said tract of land, intestate, and without issue, and unmarried; leaving Mary Sloan, Jesse Sloan, and David Sloan, his brothers and sister, children of the said Mary Sloan, by her said father as aforesaid, him surviving.

That the said Mary Sloan, Jesse Sloan, and David Sloan, being possessed of and claiming title to the said tract of land, called "Grassy Cabin," by descent from the said John Joseph Sloan, conveyed the same, by a deed of bargain and sale duly executed, acknowledged, and recorded according to law, to Jacob Blougher and Daniel Blougher, the defendants.

After the death of the said John Joseph Sloan, the plaintiff, Henry Brewer, obtained out of the Western Shore land office, a special warrant of escheat, to re-survey and affect the said tract of land, called "Grassy Cabin," for an alleged want of the heirs of John Joseph Sloan, who died seized thereof, in fee, and intestate as aforesaid; and the patent was granted to the said Henry Brewer.

The patent was in legal form, and recited the escheat of the land, "for want of heirs of John Joseph Sloan, who died seized of the premises."

The question for the decision of the Circuit Court, upon these facts was, whether, upon the death of the said John Joseph Sloan, according to the laws and statutes of Maryland, the said tract of land, "Grassy Cabin," did not pass by descent to the said Mary Sloan, Jesse Sloan, and David Sloan, his illegitimate sister and brothers as aforesaid. If the Court shall be of opinion that the said tract of land did not so pass by descent, then judgment to be given with costs for the plaintiff. If the Court shall be of opinion that the said tract of land did so pass by descent, then judgment to be given with costs, for the defendants. Either party to be at liberty to appeal or sue out a writ of error; it being admitted that the value of the land in controversy is at least twenty-five hundred dollars.

The Circuit Court gave a judgment for the defendants; and the plaintiff prosecuted this writ of error.

The case was argued by Mr. Pigman, for the plaintiff in error, who also submitted a printed argument by Mr. Mayer, also for the plaintiff. A printed argument for the defendants was submitted to the Court by Mr. Price.

Mr. Pigman, for the plaintiff.

The plaintiff in error, being a citizen of the state of Pennsylvania, claiming title to the tract of land called "Part of Grassy Cabin," which is mentioned in the declaration in the record, as being in Allegany county, in the state of Maryland, brought his action of

ejectment against the defendants in error, residing in the latter state, in the Circuit Court of the United States for the District of Maryland, to try his title to said tract of land. The plaintiff holds title to his land by patent from the State of Maryland, issued by the legal authorities of that state, upon an escheat warrant from the land office, by virtue of the acts of Maryland, of October session, 1780, ch. 51, sec. 5, and 1781, ch. 20, sec. 8. The plaintiff applied to the land office of the state of Maryland for his escheat warrant, upon the ground that one John Joseph Sloan died in the state of Maryland, intestate, seized in fee simple of the land mentioned in his patent, without issue, and without heir or heirs who could have inherited. The facts upon which the questions of law will arise are settled by agreement filed by consent, and make part of the record.

The act of 1780, ch. 51, sec. 5, enacts "that any lands within the state of Maryland, of which any person shall die seized in fee simple, without any heir of the whole blood who could inherit, or without leaving any relative of the half blood, such lands shall escheat to the state." And by the act of 1781, ch. 20, sec. 8, escheat warrants are authorized to be issued from the land office "when the owner shall die intestate, seized in fee simple, without having any relation of the half blood within two degrees, as the same are reckoned by the common law, and without leaving any relation who might inherit."

It appears by the agreement of counsel filed in the cause, that one John Sloan, late of Allegany county, was twice married : by his first wife he had but one child, namely, Mary Sloan; and by his second wife he had the following children, namely, William Sloan, John Sloan, Elizabeth Sloan, Peggy Sloan, Sally Sloan, and Jane Sloan.

After the death of his second wife, the said John Sloan lived, and cohabited with, and married Mary Sloan, his said daughter by his first wife; and had by her the following children, namely, William Sloan, John Joseph Sloan, Mary Sloan, Jesse Sloan, and David Sloan; and that William Sloan is since dead.

The said John Sloan being seized and possessed of a tract of land lying in Allegany county, called " Grassy Cabin," containing four hundred twenty-seven and one-fourth acres, conveyed the same by deed of bargain and sale, for a valuable consideration, to the said John Joseph Sloan.

The said John Joseph Sloan died about the year 1832, seized and possessed of the said tract of land, intestate, and without issue, and unmarried, leaving Mary Sloan, Jesse Sloan, and David Sloan, his brothers and sister, children of the said Mary Sloan, by her father, as aforesaid. The said Mary, Jesse, and David, conveyed the said tract of land by deed to Jacob Blougher and Daniel Blougher, the defendants.

After the death of the said John Joseph Sloan, the plaintiff in error obtained out of the Western Shore land office, in the state of Mary-

[The Lessee of Brewer vs. Blougher.]

land, a warrant of escheat, to re-survey and affect the said tract of land, called "Grassy Cabin," for want of heirs of John Joseph Sloan, and obtained his patent, which patent appears in the record.

The question for the decision of the Circuit Court by the agreement filed, was, whether upon the death of the said John Joseph Sloan, according to the laws and statutes of Maryland, the said tract of land, called "Grassy Cabin," did not descend to the said Mary Sloan, Jesse Sloan, and David Sloan, his illegitimate sister and brothers, as aforesaid. The Circuit Court, upon the facts stated, gave judgment for the defendants, upon the ground that the said tract of land did descend to the said Mary Sloan, Jesse Sloan, and David Sloan. From which judgment the plaintiff appealed to this Court.

It is admitted in the statement of facts that John Joseph Sloan, and his brothers and sister the children of John and Mary Sloan, as aforesaid, were illegitimate; the marriage of the father and daughter being prohibited and made void by a law of Maryland, entitled, "an act concerning marriage," passed in 1777, ch. 12.

At common law, therefore, John Joseph Sloan, and his brothers, and sister, being bastards, in the eye of the law, were nullius filius, and incapable of inheriting as heirs either to their putative father, or mother, or to any one else; and John Joseph Sloan, in regard to the common law, having died intestate, and without heirs of his own body, the tract of land called, "Grassy Cabin," escheated to the state of Maryland, and was properly granted by patent to the plaintiff in error.

But it is contended on the part of the defendants, that by a law of Maryland, of 1825, ch. 156, entitled, "an act relating to illegitimate children," the brothers and sister of John Joseph Sloan, who survived him, were such heirs at law, and relations of their deceased brother, to whom his said estate might descend; and that said estate did not, therefore, escheat to the state of Maryland.

We contend on the part of the plaintiff in error, that the Circuit Court committed an error in this; that upon the statement of facts and the laws of the state of Maryland, the judgment of the Circuit Court ought to have been given, for the plaintiff, and not for the defendants:

1. Because the plaintiff's patent for his land, issued by the legal authorities of the state of Maryland is good, and that he had, therefore, a right to recover his title in the Circuit Court: the said John Joseph Sloan having died intestate, without issue, or heirs or relations that could inherit.

2. Because, notwithstanding, by the letter of said law, there is but one category of illegitimate children; it was never intended to extend to children of incest; and more especially to children of incest from father and daughter.

3. Because the law of 1825, ch. 156, from its ette and terms, is morally and legally impossible to be executed w th a iy reasonable certainty; and cannot be executed in any of its parts, if the whole

ought not to be received, in consequence of the absurdities to which it leads.

4. Because the proviso of the law is repugnant to, and contradicts, its purview, or first providing clause, and renders the whole null and void.

5. Because it was not the intention of the legislature to embrace any illegitimate children, but those who could be legitimated by marriage and acknowledgment of the parents.

With regard to the first and second points, it is not necessary to proceed with an extended argument, because the correctness of the position contained in them depends upon the other points stated, and more especially, perhaps, on the fifth.

In regard to the third, it is proper to observe, that the act of 1825, ch. 156, has never received any construction by the Maryland Courts; and is, therefore, open for the judgment of this Court, and must now be finally settled by it.

As it stands upon the statute book with all its latitudinous letter, it is sui generis. Though of an exceedingly general and comprehensive character, it occupies but a small space in print. At a first glance, it appears to be sensible enough, as the offspring of a grave legislative body. But when we approach it with sedate and sober inquiry, to ascertain its meaning and bearing, and the great design of the Maryland lawgivers of 1825; it may be termed not inaptly, monomaniac; without great caution in bringing to our aid the most rigid rules of construction, it will carry Maryland back, without the intention of her legislature, to the most dark and uncivilized ages of antiquity. It is no well inspired oracle, but rather a rickety bantling of the law, that ought not to thrive in the nursery of judicature.

To enable us the more clearly and successfully to present our objections to this act, we will present to the Court the incontrovertible law maxim settled by Lord Coke, and his associates, in Dr. Benham's case, in 4 Coke's Reports, 368. It was in that case settled, that when an act of Parliament is against common right and reason, or repugnant, or impossible to be performed, the common law shall control it, and adjudge it to be void. In discussing this maxim, so sound and pregnant with good sense, we shall apply it by analogy to the act under consideration.

This maxim, if applicable to the act in question, will not only be entitled to great reverence and respect, but will be received as proper law, to overthrow and altogether reject the act of 1825.

All legislative enactments which change and restrain the common law, shall be taken stricti juris, 19 Viner's Abridg. 524, sec. 125; and this rule will be claimed as settled, both in regard to our objections to the act in limine, which are intended to overthrow and reject it; and in discussing its merits, when looking for the meaning and intention of the legislature.

The original design of the first move of the Maryland legislature of the session of 1825, appears to have been to provide, that from

[The Lessee of Brewer vs. Blougher.]

and after the passage of the act, the illegitimate children of any female should be able and capable in law to take and inherit both real and personal estate from their mother, or from each other derived from their mother, in like manner as if born in lawful wedlock. This, with proper guards and limitations, would have been sensible and right enough; and the only mischief to result from it, would be to indirectly encourage the illicit commerce of the sexes. But it more accords with natural justice, that the illegitimate children of any female, within proper limits, should inherit her estate, rather than her brothers and sisters and other collaterals. But how utterly thoughtless and careless, even in this, the legislature has been! Suppose such female should have illegitimate children by one man, and afterwards marry another, and have children in lawful wedlock, and dies seized of real and personal estate: how shall such estate descend? To the illicit brood exclusively, or to both illicit and marriage children? Suppose such female should have illegitimate children by one man, and afterwards marry another, and have lawful children; and afterwards break away from her husband, to whom she was affianced, which often happens, and have children in adultery, and finally, she dies intestate, leaving real and personal estate: how will such estate descend? To the first illicit brood, the second set in marriage, or the third in adultery, or will it descend equally among all?

Suppose further, that such female should have illegitimate children by a negro, which we know often happens in the lower ranks of life, after she has had white illegitimate children, and dies intestate seized of real and personal estate: is it to descend equally among the blacks and whites? We have no definitions, limitations, or guards in all such matters; except the proviso, so important to the purity and correctness of social intercourse in the state. And even in regard to the right of inheritance of illegitimate children from their mother, for the want of proper guards, the act in question is clearly unreasonable. And if the maxim of Lord Coke, that "an act of Parliament against reason is void," is to be received in this Court; the law ought to be rejected, and all claims to titles to property under this law ought to be arrested by the judgment of this Court.

But the act of 1825, ch. 156, is still more unreasonable, and objections increase and thicken upon us as our examination is in progress. From the careless manner of its enactment, the legislature has rendered itself liable to be misunderstood, and its true intention frustrated. It has, indeed, if the letter be adhered to, made a general act to direct descents for the benefit of all illegitimate children of any female who is the propositus in the law, and who is to be the stirps whence these relations are to branch out, from fathers and mothers without marriage; and this too, embracing bastards issuing from adultery, and from incest of father and daughter, and even son and mother; if the depravity of the human heart shall ever let loose such unbridled passions: and also embracing in its

confusion, bastards lineal and collateral, running into the same incest and adultery, and bastards of colour mingled with whites, and all too in like manner as if born in lawful wedlock. But in such a state of illegitimacy, how could persons and families proceeding from such female, as the root, establish their right to inherit any estate from each other? According to the position assumed, (i. e. if the letter be strictly adhered to,) here is a general act to direct illegitimate descents; and all the issue both lineal and collateral, in the ascending and descending lines, to endless generations, would be capable of inheriting from the "female," who is named as the propositus in the law. Does it require any argument to demonstrate that such a law could not be enforced, because it would be impossible to trace such issue with any thing like certainty? Yet if the law be received by this Court in the full sweep of its letter, it must stand in the statute book like all other acts to direct descents, for the benefit of all persons claiming under it. But how could be traced the ancestors of a bastard, up to a grandfather or great grandfather, grand uncle or great grand uncle, in the ascending line; or the reverse in the descending line, all too, in bastardy? When lineage is traced within the pale of wedlock, there is evidence and certainty to rest upon; but without that sacred union, all is incertitude and confusion. To ascertain the pedigree of an individual whose ancestors were all bastards, would be impossible. It is, therefore, impossible to execute the law, according to the letter; and it cannot be so received by judicature.

Suppose Maryland, or any state in this Union, should pass a general law to direct descents of real and personal estate, out of wedlock. Could it lead to any thing else but absolute confusion? But if the letter of the act of 1825, ch. 56, be adhered to, it is necessarily just such a law as that supposed; and necessarily leads to the same absurdities and unreasonable results, and is equally impossible to be executed. Can it, then, be received in one part, if the whole together is unreasonable and impossible to be executed?

4. The proviso of the law is repugnant to, and contradicts its purview or first providing clause, and renders the whole null and void.

The proviso is as follows: " Provided, that nothing herein contained shall be construed to alter or change the law respecting illegitimate persons, whose parents may after the birth of such persons, and who are by them acknowledged, agreeably to the seventh section of the act of Assembly, passed at December session, eighteen hundred and twenty, chapter one hundred and ninety-one."

There is no principle better settled, than that if the proviso is directly repugnant to the purview, the proviso shall stand and operate as a repeal of the purview. 19 Viner's Abridg. 522, sec. 105.

Is this proviso, then, directly repugnant to the purview? The purview changes the law of 1820, ch. 191, sec. 7, in this; it allows the illegitimate child or children of any female, to inherit both real and personal estate from their mother, or from each other, without marriage, or acknowledgment of the father. Whereas, the act of

[The Lessee of Brewer *vs.* Blougher.]

1820, ch. 191, sec. 7, will not allow any illegitimate child or children, to be capable in law to inherit and transmit inheritance, without marriage and acknowledgment of the father. It is evident, therefore, that the act of 1825 intended to change, and did actually change, that of 1820, which the proviso declares shall not be altered or changed.

The proviso declares that the law of 1820 shall stand firm, without change or alteration ; and the act of 1825, quoad hoc, makes a very material change and alteration. Without such change and alteration, the law of 1825 would be wholly useless.

The proviso, therefore, is clearly repugnant to the purview, and overthrows the law altogether.

The counsel for the defendant has filed his brief, in which he does not deny that the proviso is repugnant; but simply states that the proviso has nothing to do with this question. He was invited by us to discuss the proviso, but has declined it.

By the fixed rules of law, we must give the act of 1825 a strict construction, as it intends to change the common law. The common law, we learned in our early studies, is the perfection of reason, and is always jealous of its own importance; and requires every statute which invades its authority to be carefully watched and strictly construed.

How, then, by strict construction, can this proviso be otherwise than repugnant? Will the Court be disposed to keep strictly to the letter in the purview, and depart from it in the proviso ?

The proviso strangled the act of 1825, and it fell stillborn from the hands of the law makers, before it saw the light, to annoy and disturb the good order and purity of social intercourse. For with the entire latitudinous results to which it leads, if unrestrained by judicial powers, it will be "a horrid monster, huge, shapeless, and deprived of sight." Conceived in ignorance, and "brought forth by presumption;" or rather perhaps from carelessness more than ignorance.

Will the Court depart from the rule, and give the act of 1825 a liberal construction, instead of holding it stricti juris? Will it apply the proviso to something beyond its letter, to bring it into harmony with the purview, and prevent it from being repugnant, and so save the law from its own nugatory terms?

One of the maxims of Lord Coke, that in regard to a repugnant clause, was received, we presume, and acted on by this Court, in the case of The United States *vs.* Cantrill, 4 Cranch, 167. That ca e was certified from the Circuit Court of the District of Georgia, and arose under the act of Congress of the 27th June, 1798, made to punish frauds committed on the first Bank of the United States. Cantrill was indicted for falsely and feloniously uttering and publishing, as a true bank bill of the United States, with intent to defraud one William Gibson, a certain false, forged, and counterfeit paper, partly written and partly printed, purporting to be a bank bill of the United States, for ten dollars, signed by Thomas Willing,

[The Lessee of Brewer *vs*. Blougher.]

president, and G. Simpson, cashier. Upon a verdict of guilty, a motion was made in arrest of judgment, and reasons filed, one of which was, " Because the act of Congress, passed 27th June, 1798, entitled, ' An act to punish frauds committed on the Bank of the United States,' under which the prisoner is indicted, or so much thereof as relates to the charge set forth in the indictment, is inconsistent, repugnant, and therefore void."

The act of Congress, as far as it describes the offence charged against Cantrill, is in the following words : " If any person shall utter or publish as true, any false, forged, or counterfeited bill or note, *issued by order of the president, directors, and company of the Bank of the United States, and signed by the president, and countersigned by the cashier thereof,* with intention to defraud said corporation," &c. &c.

The question being submitted without argument, Chief Justice Marshall delivered the opinion of the Court, that the judgment ought to be arrested for the reasons assigned in the record. The words in italics were held to be inconsistent and repugnant, inasmuch as they made it a crime to publish as true any false, forged, or counterfeit bill or note, *issued by order of the president, directors, and company of the Bank of the United States, signed by the president, and countersigned by the cashier.* A note issued by the order of the board, and signed by the president, and countersigned by the cashier, being genuine, could not be false and forged, and could not be falsely uttered and published, and put into circulation by Cantrill or any one else, and the law was, therefore, inconsistent and repugnant. Congress was afterwards obliged to amend the law in this respect.

5. That it was not the intention of the legislature by the act of 1825 to embrace any bastards, except such as could be legitimated by marriage. We have examined with great care, and reflected much upon this branch of the cause. The law of 1825, and all other laws of Maryland, to which it refers, or to which it has any affinity, in regard to the commerce of the sexes, lawful or illicit, have been carefully examined, weighed and considered ; and all the authorities, American and British, and of other civilized states, in the least calculated to illustrate and enlighten on this point, have been collected for the examination of the Court. The result has always been the clearest conviction that the legislature of Maryland did not, at the time of passing the act of 1825, think of or intend any illegitimate child or children, except such as could be legitimated by marriage. If any other interpretation shall be made and prevail, however well intended, it will, we hold, be a violation of the legislative will.

In the argument upon this point, we shall take the following positions as true and incontrovertible. 1. That all civilized states have looked upon incest with the greatest abhorrence. 2. That no civilized state has at any time permitted illegitimate children, proceeding from incest, to inherit. 3. That it will be a severe interpretation of

the act of 1825, to settle down upon Maryland a civil code, by implication, drawn out of a law having·on its face evident signs·of·being made in a careless hour; when all other civilized states have uniformly rejected such a civil code, and when it cannot ·be doubted that Maryland herself would instantly reject such a code, if openly proposed for her. deliberation.

Incestuous marriages have always been regarded with abhorrence by the soundest writers, and the most polished states of antiquity; and, an incestuous connection between an uncle and niece has been adjudged, by a great master of public law, a nuisance. 2 Kent, 81. Burgess *vs.* Burgess, 1 Haggart's Consistory Reports, 368. And such a connection was held in equal abomination by Justinian's Code. Code 5, 8 ; 2. No civilized state has at any time allowed by law, illegitimate children, proceeding from incest or adultery, to inherit. 5 Wheaton's Rep. 262., Note A. Civil Code of Louisiana, title, Illegitimate. Children. · Napoleon Code, Illegitimate Children.

To sustain the argument upon the fifth and last point, to prove that it was not the intention of the legislature of Maryland to embrace any bastards, except such who could be legitimated by marriage, we proceed to lay before the Court all acts·of the General Assembly of that state, which may be connected with the act of 1825, by reference or affinity, in regard to the lawful or illicit commerce of the sexes. Several of them, if not all, must be taken in pari materia; and before we are drawn into the vortex of the letter of. the act of 1825, without restriction or limitation, for the better understanding of the intention of the legislature, we will collect all her legislation on this subject, to demonstrate and establish the intention and interpretation for which the plaintiff contends.

The act of 1777, ch. 12, entitled, " An act concerning marriages," to prevent incestuous marriages, settles the degrees of kindred and affinity, and makes the marriage of John Sloan and his daughter void; and by the second section of the act, a fine of five hundred pounds is imposed upon persons who violate the law. Here we will barely remark, that it ought not to be presumed that the General Assembly would authorize the issue of an incestuous marriage to inherit, when that issue proceeded from a connexion in palpable violation of a standing law of the state.

The next law which has any affinity to that before the Court, is the act to direct descents, 1786, ch. 45; and it is produced to show, that our legislature has in more than one instance, from negligence, authorized by the letter of the law a construction which the Maryland Courts would not give; always restraining the letter by judicial power to prevent mischief.

The second section of the act of 1786, ch. 45, provides how land shall descend, "first to the child or children and their descendants, if any." Now, is not "the child or children" here, as comprehensive as "illegitimate child or children," in the act of 1825? And would not the words " child or children," in the act to direct descents,

if a Court would be governed by the mere letter, embrace any child or children, in or out of wedlock, of incest, adultery, or of amalgamation? And yet his honour the Chief Justice knows, that our constant exposition of the act to direct descents is, that it shall be confined to a child or children born in wedlock, or legitimated by marriage, according to the degrees of kindred and affinity settled by the marriage act of 1777.

Again, by the seventh section of the act of 1786, to direct descents, it is enacted, "that if any man shall have one or more children by any woman whom he shall afterwards marry, such child or children, if acknowledged by the man, shall, in virtue of such marriage and acknowledgment be hereby legitimated, and capable in law to inherit and transmit inheritance, as if born in lawful wedlock." Now by the letter of this section, the marriage act is changed; and the man is at large to marry his daughter or his mother, hi neighbour's wife, or his negro slave. And yet his honour the Chief Justice knows, that our uniform exposition has been, that the letter shall be confined to a woman according to the degrees fixed by the marriage act of 1777.

The act of 1820, chap. 191, (which is in truth, by the reference in the proviso of the act of 1825, made part of the latter act,) in its seventh section, is precisely the same as the seventh section of the act of 1786, and would by the letter of that section change the marriage act of 1777, and allow a man in the wide field of his lust to marry his daughter or his mother, his neighbour's wife, or his negro slave. And yet his honour the Chief Justice knows, that our uniform exposition has been, that the letter shall be restrained according to the degrees fixed by the marriage act of 1777.

Can any one doubt that the legislature, when it passed the law 1820, chap. 191, and copied in its seventh section the entire seventh section of the act of 1786, ch. 45, had deliberately examined and considered the seventh section of the act of 1786, ch. 45, and intended nothing more than a re-enactment of the same matter, which it was thought fit and proper to be a standing law of the state? But it may be asked, what proof have we of this? We answer, that the legislature of 1820 inserted in the seventh section of the act of that year, verbatim et literatim, the whole seventh section of the act of 1786. Before it was thus copied, it must have been read, examined, and considered, and the contents fully known and understood, and must therefore have been fully in the legislative mind. Are we not all clearly satisfied of this?"

Now if the Court shall conclude that the act of 1825 ought to be received by judicature for grave interpretation, let us apply the same rule and mode of reasoning by analogy to the acts of 1820 and 1825; and it will be clearly demonstrated that the act of 1825 did not intend to embrace any bastards except such who could be legitimated by marriage.

It appears to us clear, that, to understand fully and without any misapprehension the act of 1825, that the act and the law of 1820

must be taken in pari materia. For this part of the argument, and to enable us to apply it with greater force, let us again refer to the law of 1825. It is entitled, "An Act relating to Illegitimate Children," and is as follows: "Be it enacted by the General Assembly of Maryland, that from and after the passage of this act, the illegitimate child or children of any female, and the issue of any such illegitimate child or children be, and they are hereby, declared to be able and capable in law to take and inherit both real and personal estate from their mother or from each other, or from the descendants of each other, as the case may be, in like manner as if born in lawful wedlock: Provided, that nothing herein contained shall be construed to alter or change the law respecting illegitimate persons, whose parents marry after the birth of such persons, and who are by them acknowledged, agreeably to the seventh section of the act of Assembly, passed at December session, eighteen hundred and twenty, chapter one hundred and ninety-one."

Notwithstanding it is evident that this act was passed in a careless hour, without proper guards and limitations in the purview; the proviso, although inconsistent and repugnant, will afford us a key to unlock and throw open to our minds the true meaning and intention of the legislature.

To do full justice to the legislature, the act of 1825 ought to be received as an appendix to the act of 1820. The proviso proves to us beyond all doubt several important matters, to enable us to discern the real intention of the legislature. When that is once clearly discerned, the judgment of this Court must, we hold, conform to it, as the only rule of construction.

In the first place, the proviso informs us, by the very special and particular reference to the year, chapter, and section of the act of 1820, that the committee, or persons having the matter in charge, had carefully and deliberately examined the act of 1820, and reported their proceedings to the legislative body before the passage of the law. The question here is, what evil or grievance did the legislature discover as still existing under the act of 1820, ch. 191, sec. 7, which ought to be provided for and redressed? The evil and grievance discerned was evidently this, and nothing more: That by the act of 1820, ch. 191, sec. 7, no illegitimate child or children could be legitimated so as to be capable in law to inherit or transmit inheritance, without marriage and acknowledgment of the father. If any woman, being seduced by the artful addresses of a man, shall have an illegitimate child or children, and die intestate, leaving real and personal estate, it is but just and honest that such estate shall descend to her own natural children, in preference to a descent to her collateral relations. When reading, deliberating on, and examining the act of 1820, ch. 191, sec. 7, did the legislature find any other bastards than such as could be legitimated by marriage? Is there the least shadow of reason to suppose that any others entered at all into the mind of any member of the legislature? Nay, does not the proviso itself take us back to the act of 1820, ch. 191, sec.

[The Lessee of Brewer *vs.* Blougher.]

7, and point out exactly the illegitimate child and children the legislature had in view? If we had been present and witnessed all the deliberations on the subject; if we had now every member of the General Assembly before us as witnesses, and they should all inform us that nothing more was intended than such children as were found named in the act of 1820, ch. 191, sec. 7, could it be more conclusive than the information given by the proviso?

The proviso is certainly part of the law of 1825, and must be brought to our aid in the interpretation of that law. For nothing is better settled than this, that "one part of an act of parliament may expound another." 19 Vin. Abr. 527, sec. 149, and the references there. This is often done, even where there is no express saving in form, when it evidently leads to the true meaning of the legislature. Wo be to any Court that shall consider itself in absolute control by the mere letter of this legislative enactment, evidently leading to mischief; and when the law presents a clear presumption that the legislature intended something other than the letter. Can we believe that children of incest, adultery, and amalgamation were ever intended by the law? Take out, we pray, this hybridous and impure issue, or you will do great injustice to the intention of the legislature.

To further illustrate and prove that the legislature by the act of 1825, intended to embrace only such children as could be legitimated by marriage, according to the act of 1820, ch. 191, sec. 7, we will now refer to several other Maryland laws, which by their affinity properly belong to the argument. And as we progress, we shall insist that the legislature, when merely remedying a grievance still existing in the state, could not by this enactment, sweeping as are its terms, have intended to abandon the fixed standard of purity so long erected by the sages of Maryland.

And what is that standard of purity, as gathered from all her laws upon the subject? Let us pass them in review, as proposed, in order to discover it.

By the act of 1777, ch. 12, a penalty of five hundred pounds is incurred by persons who shall consummate an incestuous marriage.

By the act of 1715, ch. 27, sec. 3, every case of adultery is punished by fine.

The commerce of the two races of whites and blacks has, by the laws of the state, been strictly prohibited. A free negro or mulatto intermarrying with a white woman, becomes a slave for life. A white woman having issue by any negro or mulatto, is made a servant for seven years. White men having issue by any negress or mulatto, become servants for seven years. Free negro or mulatto women, having bastard issue by white men, are subject to the same penalty. Acts of 1715, ch. 44; 1717, ch. 13; 1728, ch. 4.

Now can it be supposed that the legislature, being cognisant of all these laws, and knowing the universal sentiment of the state in reference to their purity, could have intended at once to abandon them all, and provide for all the illegitimate and illicit issue that can by any

possibility be reached by the letter of the act of 1825? Bear in mind too, that there never had been in the history of Maryland any illegitimate children under the fostering hand of the government, except such as could be legitimated by marriage. Can it be supposed, then, that the legislature intended thus at once to abandon all her former policy and purity; and make provision for all the incestuous, illicit, and hybridous issues within the scope of the letter of the act of 1825? Surely, surely not.

Throughout the argument, we have held the governing rule to be, that the judges ought to interpret the law, and not to make or give law. This rule makes it the more proper that the greatest care and diligence should be used: first, in bringing to our aid the grand and leading objects of the Maryland legislature, in passing the law of 1825; and then in considering every part of that law with its reference and appendage. When putting a construction upon any statute whatever, the judges will endeavour to save the legislature from absurdity and folly; as it cannot be presumed that men of sound minds would willingly and deliberately stultify themselves. But above all things, and most especially will the judges endeavour to arrive at the intention of the legislature; and when that is once ascertained, readily gratify it, no matter how loose or careless may be the language in which that intention is clothed. We have endeavoured to show, that any other construction than that for which we contend, would involve the legislature in folly; and further, we think we have disclosed the true, clear intention of the legislature in passing the act of 1825; both from the universal sentiment of the state, as well as all prior Maryland laws on the subject, and particularly that important one which the act in question expressly refers to by year, chapter, and section.

As a leading case upon the construction of statutes, which directs the judges to restrain the letter in order to get at the intention, we cite Dr. Bohman's case, 4 Coke's Rep. 368. 19 Viner's Abridg. 514, sec. 34; 518, sec. 81, and the note 519, note 522, sec. 109, note 523, sec. 116; 527, sec. 149.

Judges have power over statutes to mould them to the truest and best use. 19 Viner's Abridg. 528, sec. 154. 158, 159.

When laws or statutes are made, yet there are some things which are exempted and foreprized out of the provision thereof, though not expressly mentioned. 19 Viner's Abridg. 527, sec. 147; 524, sec. 119; 523, sec. 116; 514, sec. 27—31.

Statutes which restrain the common law to be taken stricti juris. 19 Viner's Abridg. 524, sec. 125.

Our researches, for the better understanding of the matters involved in this discussion, have informed us, that all civilized states that have deliberately formed a civil code, uniformly have prohibited the issue from incest or adultery from the right of inheritance. Shall Maryland, then, by mere implication, and a forced construction of a single act of her legislature, evidently made for another

purpose, have a civil code fixed upon her, that her people have ever abhorred; and which, if proposed openly, would be instantly rejected by her legislature? Such an important code as that, dissenting from all civilized usage, ought never to be fastened upon any modern state. We have endeavoured to maintain, that it is not the civil code of Maryland, and that it never will be with the consent of her people; and now, as one of her citizens, we enter our protest against such a presumption.

A printed brief has been filed in Court, by the counsel for the defendant. But it mistakes our position. It supposes that the plaintiff desires the Court to punish the incestuous issue of John and Mary Sloan; and contends that the plaintiff is endeavouring to make such issue something more than illegitimate. This is not that for which the plaintiff contends. The purity of the law, which always extends less favour to illegitimate children than to legitimate, was not intended to punish the innocent, but to prevent the illicit commerce of the sexes. The illegitimate children from the incest in this cause, are, it is true, illegitimate. But they are not such as the legislature intended to embrace.

We think we have demonstrated this clearly and successfully to the Court. If they were not intended to be embraced by the legislature, this Court cannot embrace them. If so, this Court would be making a law, not interpreting that before it.

Mr. Price, for the defendants in error.

John Sloan, having married his own daughter, and having had several children by her, conveyed to one of those children a tract of land, and upon the death of such grantee, the rest of the children, claiming the property by descent, conveyed the same to the defendants in error. The question is, and it is the only question in the case, whether a good title did not pass by descent from the grantee of John Sloan to his brothers and sisters?

The act of 1825, ch. 156, (of Maryland,) provides, "That the illegitimate child or children of any female, and the issue of any such illegitimate child or children, be, and they are hereby declared to be, able and capable, in law, to take and inherit both real and personal estate from their mother, or from each other, or from the descendants of each other, as the case may be, in like manner as if born in lawful wedlock." Then follows a proviso, which has no application to the present question.

If this were the case of legitimate children, their right by descent would not, as it could not, be questioned. But the act provides that illegitimate children shall inherit "in the same manner as if born in lawful wedlock." There is no distinction, therefore, in this connection, between legitimate and illegitimate children; they all take alike.

It is admitted that these children are illegitimate, and in that respect are within the letter of the law; but it is insisted that they

are something more than illegitimate, being the fruits of an incestuous commerce between the father and daughter, and for that reason not within the intention of the law makers.

It is supposed that the Court will feel itself called upon to show its disapprobation of the incest of the parents, by withholding from their unoffending offspring, property, to which, in other respects, they have a good title. The law, however, declares that the sins of the parents shall not be visited upon the children. And is this forbidden by any canon of the moral code? On the contrary, is it not wise and just to enable the children to rise above the degrading accidents of their birth, by placing within their reach every means of improvement, and every incitement to a virtuous and exemplary life?

But if they are to be marked and degraded as victims, why not carry it out fully and effectually? Why permit them to vote at the elections? or to hold any office? or to marry into honest families? or to hold property by purchase?

It is conceived to be necessary to punish incest. And how is it proposed that this shall be done? It is by suffering the guilty to escape, and by seizing the innocent, and making them bear the penalty. The parents were permitted to hold and enjoy this property all their lives; and, after their death, the law is to step in and take it away from the children, as an example to the parents.

But why speak of punishing incest? It is no crime. These parents were permitted to live in open incest, because there was no law to punish them. We feel it to be immoral and highly revolting; but, in reference to the criminal law, it is an act perfectly innocent. It is a little surprising, therefore, that the Court should be called upon to visit, with condign punishment, an act which the law does not regard as calling for penalty or punishment of any kind.

Mr. Mayer, for the plaintiff in error.

The decision here depends on the construction of the law of Maryland, (1825, ch. 156,) which enacts, "That the illegitimate child or children of any female, and the issue of such child or children, shall be able and capable in law to take and inherit both real and personal estate from their mother or from each other, or from the descendants of each other, as the case may be, in like manner as if born in lawful wedlock: Provided, that nothing in this act contained shall be construed to alter or change the law respecting illegitimate persons whose parents marry after the birth of such persons, and who are by them acknowledged, agreeably to the seventh section of the act of Assembly, passed at December session, eighteen hundred and twenty, chapter one hundred and ninety-one."

The defendants claim under the title of one of an incestuous issue; and upon the ground that one of that issue may inherit from another, under the law now quoted. The act of 1820, ch. 191, sec. 7, referred to in the proviso of that just recited, declares that "if any man shall have a child or children by any woman whom he shall after-

wards marry, such child or children, if acknowledged by the man, shall, in virtue of such marriage, be hereby legitimated, and capable in law to inherit and transmit inheritance, as if born in wedlock."

A marriage was had between the parents of the incestuous offspring; and it is contended by the plaintiff, that so far as they were born before the marriage, they must seek for legitimation under the act of 1820, ch. 191, sec. 7; and if born after the marriage, they must rely on the marriage as their sanction, if they are to have any legitimate standing. This latter provision of the Maryland law, and the cited act of 1825, ch. 156, must be taken together in construction ; and we maintain that the whole enactment meant to provide for those whom it was possible for the marriage ceremony to have made legitimate; and that when the ceremony has in fact been performed, and yet can in law have no effect, the offspring are not within the contemplation of the act of 1825, ch. 156: the just deduction from the entire legislation being, that those were regarded who needed only the lawful union of their parents to make them legitimate, and that legitimacy in this legislation is thus to be contra-distinguished to illegitimacy. As a part of the series of enactment, there should also be considered the Maryland act of 1777, ch. 12, sec. 1, which contains penal prohibitions of marriages within certain degrees. If this interpretation be sound, the offspring in question could not be within the benefit of the act of 1825, ch. 156, the marriage to which they must appeal being unavailing, and no lawful union—the possibility contemplated by the act—being practicable between their parents. For if we are to characterize the issue, we must look to the putative and admitted parents, and to the particular case; and seeing the relations of the parties themselves, we must find that they could not come within the condition of "lawful wedlock," in the view of the act. They never could have been born in "lawful wedlock."

Whatever may be our sympathies in such instances, we are constrained to look at pretensions through the stern medium of the common law policy, disqualifying as it is against the issue of illicit alliances. It makes no provision itself for such offspring by its policy, whatever may be the duty of the parents, who are therefore left free to make retribution to them for the dishonour of their birth. All statutes like that under consideration, interpreted as they must be in reference to the strict general policy which pervades our common law, are to be limited to the instances clearly within them, and are to be construed in obedience to the common law principles, so far as those are not unequivocally superseded by the statute enactment. This view enforces the interpretation we would assign to the act of 1825, ch. 156. In the particular case, too, before the Court, not only does the interpretation contended for subserve the general policy of the common law, in its repugnance to illicit connexions, but it is demanded by the special odium in which it denounces such alliances as that which is the revolting feature of this case; and against which Maryland legislation has so emphatically

and studiously guarded the social morals by the act of 1777, ch. 12. All such unions and their results seem to be peculiarly offensive to our common law; and particularly when of the infamous order of that which this case presents. The offspring of incest are not admissible within the general denomination of mere illegitimate issue, and should be specially designated to entitle them to enjoy the advantages of any particular legislation. 2 Kent's Com. 71, 72.

However general, then, the terms of a law may be in favour of illegitimate issue, it is reasonable to require, in conformity with the feeling the law entertains towards incest, that the common law regarding marriage as the only test of legitimation, should exclude incestuous offspring from ordinary illegitimacy, and require them to be specifically designated. There are many cases where general terms, which might embrace certain objects, are limited in import by reference to paramount principles or institutes of the common law, which are allowed to be invaded only by express terms. The aversion of the common law may, in its bearing on the exposition of a statute, as to illegitimates, be regarded as akin to those jura naturæ which are termed even leges legum. Hob. 87. Indeed the common law (2 Kent's Com. 72. Vaugh. Rep. 206. 2 Vent. 9) pronounces incestuous marriages to be against the law of nature. There are a number of instances, as marked as that now contended for by us, of a restricted construction of general words in a statute, in due respect to a policy, or to certain deeply seated principles of the common law. 6 Bac. Abr. Statute, 381—387. 1 Brockenbrough's Rep. 162.

But however we may admit that the offspring of incest may, under this act of 1825, be recognised in point of parentage as to the mother, and may inherit her estate from her or from one another, is collateral inheritance, as here claimed, allowed under it? The act declares that the illegitimate children of any female may "inherit" real estate from her and from each other. The term "inherit" has a technical meaning, and has regard to the principles which at common law regulate the derivation of estates by descent. The descent from brother to brother is immediate, but still parents must be found who shall be the actual or assumed fountain of inheritable blood, and create the kindred of brothers. 2 Bl. Com. 226—228. This act of 1825 contravenes the common law in its maxim that an illegitimate child is nullius filius only so far as its express provisions go: and the utmost that can be said as to the parentage with which it endows the offspring, is, that it gives them a mother. It gives them no father, and does not constitute between the children the relation of brothers and sisters. In Stevenson vs. Sullivan, 5 Wheat. 207, the terms of the Virginia act came into question, which allows illegitimate children to inherit from the mother, and "transmit inheritance" on part of the mother. The Court determined that descent was not permitted by the act from brother to brother, not only because the words "on part of the mother" confined the taking by inheritance through the mother, in the ascending or descending line;

but also, because, although the bastards, as the Court says, "are, in these respects, quasi legitimate, they are, nevertheless, in all others, bastards, and as such they have and can have neither father, brothers, or sisters." The Court also say, that in the construction of the act, "it is never to be lost sight of that the appellants are to be considered as bastards, liable to all the disabilities to which the common law subjects them, as such; except those from which the section itself excepts them; thus indicating that the strict maxims of the common law are to be adhered to, and the privileges of bastards narrowed in reference to them in the construction of these enfranchising acts. Now the terms in the Virginia act, which allow the children to transmit inheritance, would, in case of legitimate issue, cover the descent from brother to brother; and yet, even apart from the restrictive words, "on part of the mother," the Court regards this transmitting power to the children as not instituting collateral descent, or in other words, as not, ex vi terminorum, creating the constructive relation of brothers and sisters, without express words in the act giving a perfect parentage constructively to the children. The Virginia act, as explicitly as the Maryland, conferred a mother on the children; and in giving the children the capacity to "transmit inheritance," the Virginia act yields all that the Maryland act grants in declaring that the children may inherit from each other : for certainly a collateral descent is a transmission of inheritance. So the case of Stevenson vs. Sullivan treats it, when showing that, even not regarding the terms "on part of the mother," there could be no descent in the case from brother to brother, although the children were endued with the capacity of transmitting inheritance. According, then, to that decision of this Court, there can be no inheritance here between brother and brother, under the Maryland act of 1825; and for the reason there stated, that, although a mother is recognised by the Virginia act, as in the Maryland, yet the children had, in contemplation of law, no brothers nor sisters. According to the decision, even without the words "on part of the mother" being connected with the transmitting of inheritance by the children, their capacity to inherit would be limited to the estate of the mother. In every case of a descent from brother to brother, although it is immediate, there must be fathers to whom the kindred may be traced, although they be not named in deriving the estate, which is the subject of the collateral descent, 2 Black. Com. 226. The paternity is the essential clue to learn the kindred, whether it be of the whole or half blood; and the primary element in this ascertainment is wanting where no father to either party is to be found, and when the law itself declares that there is none. The relation of whole and of half blood depend in the derivation of descent on the question of community of father and of mother, unless when the estate comes from the mother. Such is the necessary rule from the theory of feudum novum ut antiquum.

Thus it is not sufficient here to say, that by the law of Maryland the half-blood may inherit among brothers and sisters, for we have

seen that .n ascertained paternity is essential to determine the relation of whole or half-blood among brothers and sisters. The law of Maryland gives the right to the half-blood only where it is ascertained that there is no brother or sister of the whole blood; a provision which looks to the possible existence, at least, of fathers. Where the law itself, in the confessed circumstances, leaves an utter blank for the father, and declares it a legal impossibility that there should be one, we may at least say that the statute of descent, which pre-supposes a necessary ascertainment of a father, does not comprehend a case where the law declares itself that there can be none, and can be no such ascertainment. The case, then, of such collateral succession between illegitimates must be regarded as a casus omissus from our Maryland Law of Descents, (see the Act of Descents, 1820, ch. 191,) and the common law must regulate as in another case of casus omissus, as the same was done in Barnitz *vs.* Cassey, 7 Cranch, 456. There could, then, be no inheritance of the half-blood between these illegitimates; even assuming that the tests are erroneous, which an effort has been made to show are those exclusively applicable.

The result of these views, which conform to the well established principles of the common law, unimpaired by the act under consideration, is, that the act allows the illegitimate issue to inherit from their mother, and to inherit from each other estate derived from the mother, but not estates of purchase, as is the character of the estate in question in this cause. Our exposition gives effect to every provision of the act, according an inheritance collateral as well as lineal; but modifying the scope of the act by rules of the common law, which must govern and limit the innovation introduced: unless those rules be, by the terms of the new legislation, expressly, or by necessary implication, superseded: an implication so clear and irresistible that no construction of the law is possible, consistently with the operation of those rules.

. The Chief Justice TANEY delivered the opinion of the Court.

This case depends upon the construction of the act of Assembly of Maryland, passed at December session, 1825, ch. 156, entitled, "An act relating to Illegitimate Children." By this act of Assembly, " the illegitimate child or children of any female, and the issue of any such child or children," are declared to be incapable in law " to take and inherit both real and personal estate from their mother, or from each other, or from the descendants of each other, as the case may be, in like manner as if born in lawful wedlock."

It appears from the record, that a man by the name of John Sloan had several children, who were the issue of an incestuous connection of a shocking character. He conveyed a tract of land, called "Grassy Cabin," situated in Allegany county, in the state of Maryland, to John Joseph Sloan, one of these children. John Joseph Sloan, the grantee, died about the year 1832, intestate, and without issue; and seized in fee simple of this land. Two brothers and one sister, the

R 2

issue of the. same incestuous intercourse; survived him; and they conveyed the land to Jacob Blougher and Daniel Blougher, the de-fendants in error.

The plaintiff in error, after the death of John Joseph Sloan, took out an escheat warrant for the above-mentioned tract of land, upon the ground that there could be no lawful heirs of the said Sloan; and having obtained a patent for the said land, he brought an ejectment for it, in the Circuit Court of the United States for the District of Maryland; and the judgment of that Court being against him, the case has been brought here by a writ of error.

There is no controversy about the facts in the case. It was tried in the Circuit Court upon a case stated; and has been elaborately argued here, and many authorities cited to show that the Court, in construing a statute, may restrict the literal meaning of the words used in order to effectuate the intention of the legislature.. The plaintiff in error contends, that in passing the act of Assembly above mentioned, the legislature never contemplated a case like the present; and never intended to give the right of inheritance to the children of an intercourse so deeply criminal.

It is undoubtedly the duty of the Court to ascertain the meaning of the legislature, from the words used in the statute, and the subject matter to which it relates; and to restrain its operation within narrower limits than its words import, if the Court are satisfied that the literal meaning of its language would extend to cases which the legislature never designed to embrace in it.

In the case before us, the words are general, and include all persons who come within the description of illegitimate children. According to the principles of the common law, an illegitimate child is filius nullius, and can have no father known to the law. And when the legislature speak, in general terms, of children of that description, without making any exceptions, we are bound to suppose they design to include the whole class. And, as illegitimate children, in a question as to the inheritance or distribution of property, can have no father whom the law will acknowledge as such; how can we, in a controversy like this, inquire who was the father of these children, in order to determine upon their right to the property?

The expediency and moral tendency of this new law of inheritance, is a question for the legislature of Maryland, and not for this Court. It seems to have been supposed by the legislature, that as there could be no doubt of the relation which the mother bears towards her illegitimate children, the reasons of policy which must always preclude such children from claiming the inheritance of any one, upon the ground that he was their father, do not apply to the property of the mother, or the property of each other. To this extent, therefore, the right to inherit is given by this act of Assembly. And it would appear to have been given upon the principle, that it is unjust to punish the offspring for the crime of the parents. The right of the children, therefore, is not made to depend upon the degree of guilt of which they were the offspring. All illegitimate

children are the fruits of crime; differing indeed, greatly, in its degree of enormity. And the legislature, if it had seen proper to do so, might undoubtedly have made the right to the inheritance to depend upon the character of the offence committed by the parents. But they have used no language showing any such design. On the contrary, they appear to have looked at the unoffending character of the children, rather than at the criminal conduct of the parents, of whom they were the offspring.

It has been said that the expressions in the enacting clause of this act of Assembly, which declares that the illegitimate children spoken of shall be capable of inheriting from their mother and from each other, " in like manner as if born in lawful wedlock," imply, that those children only were intended to be provided for, whose parents were capable of contracting a lawful marriage with each other. The same argument has also been urged upon the proviso, which declares, that nothing in the law shall be construed " to change the law respecting illegitimate persons whose parents marry after the birth of such persons, and who are by them acknowledged agreeably to the seventh section of the act of Assembly, passed at December session, 1820, ch. 191."

We do not perceive the force of this argument. It is admitted that the act of Assembly, now in question, must be taken in connection with the previous laws of Maryland regulating the descent of real estate, and the distribution of personal property; for this law forms a part of the entire system of legislation on these subjects. But the expressions referred to in the enacting clause, so far from implying that the parents may marry, presupposes that they never will marry; and provides for the children on that account. The expressions are evidently used merely to denote the shares and proportions in which such children are to take; and the reference for the rule is made to children born in wedlock, in order to save the necessity of introducing into this law, a table of descents as to real property, and of distribution as to personal.

In relation to the proviso, it is proper to remark, that the rights of primogeniture were abolished in Maryland, by the act of 1786, ch. 45. There was a provision in this law declaring that illegitimate children whose parents afterwards married, and acknowledged them, should be thereby legitimated, and made capable of taking and inheriting property as if born in lawful wedlock. The act of 1820 embodied the original act to direct descents, with its various supplements, into one law; and provided for some laws of descents which had before been omitted. This act of Assembly, of course, contained the clause in favour of illegitimate children whose parents should afterwards marry, which had been introduced into the act of 1786, and which had always been the law of the state, from the time that act went into operation. And the proviso in the act of Assembly now in question, was introduced manifestly from the apprehension that the general expressions of the enacting clause of the law might be held to reach those whose parents afterwards

[The Lessee of Brewer *vs.* Blougher.]

married, and deprive them of the greater rights of inheritance which belonged to them under the previous acts of Assembly. The proviso, like the expressions in the enacting clause, shows that the legislature were not looking to children whose parents would probably marry, but to children whose parents never would marry; and they make no distinction between the issue of those who could not, and of those who would not become lawfully joined in wedlock. If from any cause whatever, the parents were never married, the children were illegitimate; and all illegitimate children, under this act of Assembly, may inherit from their mother and from each other. It follows, that the tract of land called "Grassy Cabin," upon the death of John Joseph Sloan, descended to his brothers and sister, before mentioned; and the plaintiff is not entitled to recover.

The judgment of the Circuit Court is therefore affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maryland, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court, in this cause be, and the same is hereby, affirmed, with costs.