## Opdyke's Appeal.

*Act of April 27th 1855 construed.—Right of illegitimate children to inherit from mother, along with legitimate child.—Devise of real estate to wife by husband vests title in her as the stock of a new descent.*

1. Under the Act of April 27th 1855, providing that illegitimate children shall take and be known by the name of their mother, and they and their mother shall respectively have capacity to take or inherit from each other personal estate as next of kin, and real estate as heirs in fee simple ; illegitimate children are entitled to share in the proceeds of the real estate of their deceased mother equally with a legitimate child.

2. Where a mother takes real estate by devise from her husband, she becomes the stock of a new descent, and her illegitimate children are entitled to share in the proceeds, though not of the blood of the husband from whom the estate came.

APPEAL from the Orphans' Court of *Northampton county*.

This was an appeal by Thomas R. Opdyke and Mary his wife, from the·decree of the court below on the report of the auditor on the account of Theodore Robinson, administrator of Jemima Sharps, deceased.

The case was this :—Mrs. Jemima Sharps died on the 29th of March 1861, intestate, leaving Lucinda Dunn, a legitimate child, and Mary Opdyke (wife of Thomas R. Opdyke), and Ellen Sharps, illegitimate children, who both were known by the name of their mother.   Mrs. Sharps died possessed of but a small amount of personal property, but was seised of a house and lot in the borough of·Easton, which had been devised to her by her deceased husband.   June 8th 1863, letters of administration were granted on her estate to Theodore Robinson, Esq., who by petition to the Orphans' Court of Northampton county, on the 26th day of June 1863, obtained an· order for the sale of the same, for the payment of the decedent's debts.   The administrator, on the 15th day of August 1863, sold the real estate to Darby Keleher for $800, and upon report made to the said court by the administrator, on the 21st day of August 1863, the sale was con-

firmed to the purchaser.  On the 13th of April 1864, the administrator filed his account, and on the 29th of April 1864, the same was presented to the court, and W. W. Schuyler, Esq., appointed auditor to examine, make distribution, and if necessary resettle the same.  August 19th 1864, the auditor's report was filed and confirmed *nisi*, and same day exceptions thereto filed by Lucinda Dunn.  December 19th 1864 the court, upon argument, overruled the first exception, and sustained the second exception, thereby awarding the entire balance in the hands of the accountant to Lucinda Dunn, to the exclusion of Mrs. Mary Opdyke and Ellen Sharps, and referred the report back to the auditor, with instructions to reform it, in conformity to that ruling.  December 12th 1864, the auditor filed his amended report, awarding said balance to Lucinda Dunn, and which report was confirmed by the said court.

It was contended in the court below, on behalf of Mary Opdyke and Ellen Sharps, that, notwithstanding they were the illegitimate children of Jemima Sharps, deceased, they were, by virtue of the 3d section of the Act of April 27th 1855, entitled to participate in the distribution of her estate.

From the definitive decree of the court, awarding the entire balance in the hands of the accountant to Lucinda Dunn, Thomas R. Opdyke and Mary Opdyke his wife took this appeal.

*O. H. Meyers*, for appellant.—The errors assigned raise the single question whether Mary Opdyke and Ellen Sharps, illegitimate children of Jemima Sharps, deceased, are, under the 3d section of the Act of April 27th 1855 (Brightly 564, pl. 40), co-distributees with Lucinda Dunn, a legitimate child, of the balance in the hands of the accountant, being the proceeds of the sale of real estate.

That section is as follows: "That illegitimate children shall take and be known by the name of their mother, and they and their mother shall respectively have *capacity to take or inherit* from each other personal estate as next of kin and real estate as *heirs* in fee simple."

It is contended on behalf of the appellants that they are co-distributees, and this is resisted by the appellee, on the ground,

1. That the 3d section of the Act of 27th April 1855, does not in terms repeal the 17th section of the Act of 8th April 1833 (Bright. 565, pl. 36), which provides that "the distribution of real and personal estate among the descendants and collateral relations of intestates shall be construed to mean such as may have been born in lawful wedlock."

2. That the appellant, Mary Opdyke, and her sister Ellen Sharps, are not of the blood of the ancestor (the husband of Jemima Sharps), who it is alleged devised the real estate sold by the administrator to his wife in fee simple.  And,

[Opdyke's Appeal.]

3. That the act in question does not apply to cases where the mother has both legitimate and illegitimate children.

I. So much of the 17th section of the Act of April 8th 1833, as denies the right of illegitimate children and their mother to take and inherit from each other, being in conflict and repugnant to the 3d section of the Act of April 27th 1855, is repealed by implication, especially as the legislation is *pari materia.* See Packer *v.* Sunbury and Erie Rail. Co. 7 Harris 211; Easton Bank *v.* Commonwealth, 10 Barr 448; Nusser *v.* Commonwealth, 1 Casey 126; Commonwealth *v.* Crowly, 1 Ash. 179; Johnston's Estate, 9 Casey 511, which establish that a subsequent statute by implication repeals the whole or part of a former one, where its provisions are repugnant and inconsistent; where the latter introduces a new rule, and is intended as a substitute for the former one, and especially where both statutes are *pari materia,* as the Acts of April 8th 1833 and of April 27th 1855 are.

II. There is nothing in the second objection. It is claimed that the land, the proceeds of which are for distribution, was devised to Jemima Sharps, deceased, by her husband, and that these illegitimate children, not being of the blood of the husband of Jemima Sharps, cannot inherit. Culbertson *v.* Daly, 7 W. & S. 196, decides "that where land is devised to a wife by her husband, she takes as a purchaser, the husband not being a relative to his wife, in the meaning of the intestate laws, and that on her dying intestate, the land descends to her heirs at law."

III. As there has been no adjudication on the statute in question, by the Supreme Court, the question of construction is now raised. This must primarily depend on the plain reading, spirit, and humane purpose of the law, aided by interpretations given to similar statutes in several of our sister states.

On the question of construction of statutes, Black, C. J., in the case of Packer *v.* Sunbury and Erie Railroad Company, 7 Harris 211, forcibly lays down the rule "that minute criticism upon words and sentences is not the way to make the statute plain. The best argument is to hold up the law and let it speak for itself. The broadest, plainest, and most natural view we can take of it is the one which brings us soonest to the truth." See also Commonwealth *v.* Pennsylvania Insurance Company, 1 Harris 166; Olmstead's Case, Bright. Rep. 9; Swanson *v.* Swanson, 2 Swan. (Tenn.) 446.

Applying these well-defined principles of construction to the statute in question, Mrs. Sharps's illegitimate children cannot be excluded, though she had a legitimate child at the time of her death. The letter of the statute does not say that they should. It makes no such distinctions by express words, or by the most remote implication. There are no words of exception or limitation in it. It places illegitimate children on equal footing with

[Opdyke's Appeal.]

legitimate, in respect to the right of taking and inheriting personal property and real estate from the mother.

But the law was intended to operate reciprocally for the benefit of the mother and her illegitimate children. If the law is only applicable when there are no legitimate children, then for the same reason the mother cannot take and inherit when she has, legitimate children. That is the necessary consequence of the ground taken by the appellee. This has been the construction of similar statutes in other states: Alexander v. Alexander, 31 Alabama 241; Kent v. Barker, 2 Grey (Mass.) 535; Shelton v. Wright, 25 Geo. 636; Hartwell v. Jackson, 7 Texas 576; Bennet v. Toler, 15 Grattan Rep. 588; Heath v. White, 5 Conn. 228, and Earle v. Dawes, 3 Md. Ch. 230.

*Peter Ihrie*, for appellee.—The main scope of the argument on behalf of the appellant is to show that the Act of 1855 having no words of limitation, puts legitimate and illegitimate children by the same mother, and without any regard to degree or colour, upon an equal footing before the law, and that it repeals, *pro tanto*, that portion of the general intestate law already cited, and which excludes illegitimate children from the distribution of intestate estates. If this argument holds good, then it matters not whether the mother has bastard children by the same father, or a dozen or more by as many different fathers. A woman while in her youth, and walking in the paths of rectitude and virtue, may have had offspring born in lawful wedlock, afterwards falling from this estate, and giving birth to children out of lawful wedlock, the argument of the appellant would place on one common level the children of her lawful husband with a brood of illegitimates of all descriptions, and it may be of all colours. What a commentary would such a scene invoke upon the laws of a country claiming to be civilized, professing the Christian religion, and upholding the sanctity of the nuptial tie! Among moralists the institution of marriage is sustained and encouraged because it tends to the encouragement of industry, to the comfort of individuals, and the peace, welfare, and better government of society. The common law, which declares bastards incapable of inheriting, doubtless was instituted upon higher principles than the mere interest of individuals, and most probably was intended to render illicit commerce between the sexes odious and discreditable by stamping disgrace and disabilities upon the fruits of it. Notwithstanding all this, we have now placed before us a serious argument, the immediate tendency of which is to favour a free and unlawful commerce among the sexes, and grounded upon a statute which it is said can have but one construction, to wit, that thereafter there shall be no distinction between the good and the bad, no incentive to purity and virtue, and that the legislature of Pennsylvania has solemnly

declared by its statute law that fornication, bastardy, adultery, and incest shall or may be indirectly fostered and encouraged. Again : if the argument of the appellant is sound, the statute in question is intended to regulate the distribution and descent of real and personal estate among legitimate and illegitimate children in the ascending as well as descending line, lineal as well as .collateral, and therefore a mother who dies intestate, leaving real and personal estate, the ancestors of the bastard portion of her offspring, both lineal and collateral, would also be entitled in the ascending gradè, and yet the argument is silent, and fails to point out in what manner such a lineage could be traced.

The preamble of the act, which is said to be "the key to the knowledge of it, and to open the intent of the makers," plainly shows that it is altogether remedial in its character, and although the words of a statute may admit of a doubt, the courts will put such a construction upon them as will be just and reasonable, because an implied repeal of a statute is not favoured by the law :" 1 Black. Com. 89.

Statutes are not always to be construed according to the letter, and general expressions may be restrained where from the whole law it appears the legislature intended to provide a remedy for particular cases : Bank v. Fitsimmonds, 3 Binn. Rep. 356. See also Golden v. Buck, 15 East 377 ; Brown v. Commonwealth, 9 Harris 37 ; 2 Kent's Com. 463, 2d ed.

An Act of Assembly will not be construed to repeal by implication an express enactment, unless there be a clear and strong inconsistency between them : Street v. Commonwealth, 6 W. & S. 209 ; Bank v. Commonwealth, 10 Barr 448.

We contend, therefore, that according to the true intent and meaning of the Act of 1855, its provisions do not embrace cases where the mother of the bastard, as here, leaves issue born in lawful wedlock. That it should be expounded with a due regard for the true policy of the state, in which a marked distinction has ever been maintained between legitimate and illegitimate children, and that consequently the Act of 1855 only grants to illegitimate offspring a modified or qualified inheritance in the mother's estate.

The second objection, we think, has not been answered by the opposing argument, and the case of Culbertson v. Daily, 7 W. & S., therein relied upon, does not help it, for we agree with the principle of that case, and contend that so far as it is applicable to the matter in hand, the estate of Jemima Sharps goes to her heir at law, who, we have shown, is the appellee here, and not to her illegitimate children. The real estate in question was acquired by Jemima Sharps, through means supplied by her husband, John Sharps, the father of Mrs. Dunn, the appellee, and one of the leading principles in our law of descents is to preserve real estate

in the line of those from whom it came, and to exclude all who are not of the blood of the ancestor through whom the estate was acquired : Bright. Purd. 564, pl. 27. Intestate Act of April 8th 1833, § 9.

The opinion of the court was delivered, May 11th 1865, by

AGNEW, J.—Our duty is to interpret fairly the Act of 27th April 1855, conferring the capacity to inherit upon illegitimate children and not to alter, amend, or repeal it. If the tendency of the act be to libertinism and a discouragement of marriage, it is a reason for its repeal, but we cannot interpolate terms unsupported by its language or its spirit. Before the Act of 1855, the difference between legitimate and illegitimate children, as to descendable property, was simply the capacity to inherit. The former were able and the latter unable to inherit. That act declared that illegitimate children should take and be known by the name of their mother, and they and their mother shall respectively have *capacity to take or inherit* from each other personal estate as next of kin, and real estate as heirs in fee simple. The condition of the bastard is thus changed. Before, he was *filius nullius*, now he is next of kin and heir ; before, he had no capacity or ability, now he has capacity to take or inherit. He is the son of his mother and she is his mother, so that now each may take or inherit from the other. The legislature has chosen to convey its meaning in these expressions which strike at the root of his disability by declaring his capacity. It has said that as between him and his mother he shall inherit her property, without proviso or qualification, as her heir. But how do heirs inherit ? Certainly in the manner the law provides:—if one heir, solely ; if more than one, together. How then can we say, when other heirs are also left, he shall not inherit, he shall not be an heir ? It is said another is born in lawful wedlock and therefore he shall not inherit. But in respect to inheritance from the same mother, one is as lawful as the other. As to her property neither is now illegitimate. Birth in lawful wedlock is no longer the criterion, but blood relationship. The bastard and the lawful child have now a like capacity. It would be clearly legislation on our part to say that when lawful children are born as well as bastards, the latter shall not have capacity to take from the common mother, when the law has said they shall.

We have been referred to a number of cases in other states in which the courts have held in respect to their own statutes the same doctrine we now declare. It is said that the appellant has not shown the statutes themselves, and therefore they furnish no guide to us. It is true, we do not know the terms of the several acts construed by them, but it is scarcely possible they can be more explicit and unambiguous than the Act of 1855, which, by

conferring the capacity to inherit, removes the incapacity, and by a single stroke avoids all ambiguity : Alexander *v.* Alexander, 31 Ala. 241; Huntwell *v.* Jackson, 7 Texas 576; Heath *v.* White, 6 Conn. 218; Earl *v.* Dowes, 3 Mad. Ch. 330; Brewer *v.* Bloughton, 14 Peters 178.

The argument that this interpretation is contrary to policy is not supported by the facts. This cannot be asserted against the terms of the law itself, which expressly changes the condition of bastards in relation to descent, while there are innumerable acts legitimating particular individuals. Indeed it may be questioned whether a single application to legitimate, at the instance of either of the parents, has ever been refused. The tendency of the law to immorality may also be well doubted. The fiery torrent of passion seldom stops to consider consequences. In its purpose the law looks only to the misfortune of the innocent offspring, who are compelled to bear in their persons the punishment due to a fault in which they did not share. While the law leaves them to the frown of society and the bitterness of shame, it is unwilling to add beggary to their misery by refusing them a share in the property of that one parent who is often more sinned against than sinning, and whose mother's heart yearns towards the child of her misfortune.

The argument that we should introduce into the statute the qualification that there shall be no inheritable capacity when lawful children also exist, because there is no express repeal of the 17th section of the Act of 8th April 1833, is not well founded. It provides that the distribution of real and personal estate shall be among those born in lawful wedlock. But when the Act of 1855 declared that those born out of lawful wedlock should inherit from their mother, and their mother from them, it declared that which to this extent is directly repugnant to the former law, and to the same extent therefore that law is repealed.

The objection founded upon the proviso constituting the 9th section of the Act of 8th April 1833, that the appellant is not of the blood of the husband of her mother from whom the estate came, is not tenable. Mrs. Sharps took the property by devise from her husband, and therefore became herself the stock of a new descent. She is not a relative of her husband, and taking by devise is a purchase, and not a taking by descent. This is decided in Culbertson *v.* Daily, 7 W. & S. 194. See also Simpson *v.* Kelso, 8 Watts 247; Burr *v.* Sim, 1 Whart. 252.

The decree of the Orphans' Court is therefore reversed, and it is now ordered and decreed that the sum of $464.64 be distributed in equal shares to and among Lucinda Dunn, Mary Opdyke, and Ellen Sharps, that is to say, to each the one-third thereof, and that the costs of this appeal be paid by Lucinda Dunn.