Okey, C. J.
G-eorge E. Nash, attorney-general, on October 25, 1881, filed in this court a petition in quo warranto. The action is against William H. Yanderbilt and other persons named, and it is alleged in the petition that those persons, with others too numerous to be brought before the court, have usurped the franchise to be a body corporate, under the uamo of the Ohio Railway Company, and that they wrongfully claim to possess certain corporate franchises, powers, and privileges. The prayer is for judgment ousting the defendants from exercising such franchises, powers, and privileges. The record consists of the petition, answer, reply, and an agreed statement of facts.
The burden is on the defendants to show by what authority they claim to exercise such powers, and the order of trial is the same as if the cause was for hearing on testimony. Consequently, we have held that under the statute (Rev. Stats. §§ 5190, 6760, 6772) the defendants were entitled to open and close in the argument.
The defendants claim to be such corporation, clothed with such powers and privileges, under authority of certain proceedings had in the months of July and September, 1881, whereby the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company and the Cincinnati, Hamilton and Dayton Railroad Company, Ohio corporations, were consolidated into one corporation, under the corporate name of the Ohio Railway Company.
The Cleveland, Columbus, Cincinnati and Indianapolis Railway Company is a corporation, with a line of railroad extending in a south-west direction from Cleveland, in Cuyahoga county, to Springfield, in Clark county, a distance of one hundred and sixty-three miles ; and the Cincinnati, Hamilton and Dayton Railroad Company is a corporation, with a line of *632 railroad extending from Cincinnati, in Hamilton county, via Hamilton, in Butler county, to Dayton, in Montgomery county, Dayton being in a direction east of north from Cincinnati, and distant therefrom sixty miles. The authority to make the alleged consolidation is based by the defendants on section 3379 of the Revised Statutes, which is as follows: “ "When the lines of road of auy railroad companies in this state, or any portion of such lines, have been or are being so constructed as to admit the passage of burden or passenger cars over any two or more of such roads continuously, without break or interruption, such companies may consolidate themselves into a single company.”
As the southern terminus of the first-named road is twenty-four miles from the northern terminus of the latter road, being the distance between Springfield and Dayton, it is not claimed by the defendants that the consolidation could be effected under authority of that section, if the' power to consolidate can only be exercised where burden and passenger cars can pass from the road of one company to the road of the other, “ continuously, without break or interruption.” It is said, however, that it is not essential to a valid consolidation that such companies’ own lines should be thus connected, but that where the consolidating companies, or either of them, holds from another railroad company a perpetual lease of its road, and such leased line is so constructed that cars may thus pass from the line of the lessee to the leased line, and from the leased line to the line of the other consolidating company, the latter company and such lessee may consolidate ; in other words, that such leased line is embraced by the words of the section, “ lines of road ” of the consolidating companies.
As each of the consolidating companies is possessed of such leased lines, by means of which it is said such connection is made, the importance of this contention of the defendants is manifest, and hence it is proper to state more definitely the condition and situation of the several roads affected by this controversy.
The line of the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company, as already stated, extends from *633 Cleveland to Springfield. This is by way of Galion, in Crawford county, and Delaware, in Delaware county. It also extends from tbe latter place to Columbus, in Franklin county; and another part of its line, extending from Galion to Indianapolis, Indiana, crosses the track of tbe Dayton and Michigan Railroad Company at Sidney, in Shelby county. This constitutes the line of road which it owns.
Tbe Cincinnati and Springfield Railway Company is a corporation with a line of railroad extending from a point near Cincinnati to Dayton. It also has, by lease from tbe Cincinnati, Sandusky and Cleveland Railroad Company, a line of railroad extending from Springfield to Dayton. These two lines do not directly connect at Dayton, but by arrangement between tbe Cincinnati and Springfield Railway and other railroad companies, a connection is made between tbe two roads, by means of a road used in common by several railroad companies. In 1871 tbe Cincinnati and Springfield Railway Company (party of tbe first part), the’ Cleveland, Columbus, Cincinnati and Indianapolis Railway- Company (party of tbe second part), and tbe-Lake Shore and Michigan Southern Railway Company (party of tbe third part) executed an instrument in writing, called by tbe defendants a conveyance of tbe fee, or at least a perpetual lease, to tbe party of tbe second part, and by tbe relator called a running arrangement between tbe parties, which instrument contains numerous stipulations with reference to tbe construction of tbe line between Cincinnati and Dayton, tbe division of tbe earnings, and other matters, and by force of which agreement, tbe Cleveland, Columbus, Cincinnati and Indianapobs Railway Company acquired the right to run its cars from tbe terminus of its road in Springfield to Cincinnati, via Dayton; and cars of that company pass regularly over tkp roads stated, without break or interruption, from Cleveland to Cincinnati, a distance of two hundred and forty-three miles.
Among tbe stipulations in that instrument it is proper to mention tbe following:
“ Nothing herein contained shall operate to grant and demise, or be construed to include tbe franchises to be a corporation granted to tbe party of tbe first part by the state of *634 Ohio, or any other right, privilege, or franchise which is, or may be necessary to preserve the corporate existence or organization of the party of the first part, and all the said franchises to be a corporation, and all the rights, privileges, and franchises last aforesaid arc reserved and excepted from these presents. And said party of the first part further covenants and agrees, that upon the written request of said second party, its successors or assigns, it will appropriate, under the laws of the state of Ohio, such real estate, rights, and interests as shall be required for the maintenance and operation of said railway; and the costs and damages thereof shall be paid by the party of the first part.”
“ At the end of ten years from the delivery of possession of said Cincinnati and Springfield Railway Company’s railway to the said party of the second part, the railway and appurtenances of the said party of the second part shall be consolidated with the railway and appurtenances of the said party of the first part, in case the laws of Ohio shall then permit and authorize such consolidation to be made, and said consolidation shall be made upon the basis of the proportionate values of the respective railways and appurtenances of said first and second parties, as the same shall appear by the net earnings of each for the three years next preceding the time of such consolidation.”
“The intent and purpose of this indenture is to form and construct a shorter and continuous railway between Buffalo, New York, and Cincinnati, Okioj of uniform gauge, for the transportation of persons and property between the last named cities and places beyond each, and to promote the interests of the public and the parties hereto.”
The lessor companies have at all times maintained their organizations.
In 1863, the Dayton and Michigan Railroad Company (party of the first part), owning a line of railroad from Dayton to Toledo, in Lucas county, via Sidney, a distance of one hundred and forty miles, executed to the Cincinnati, Hamilton and Dayton Railroad Company (party of the second part), a perpetual lease of its road, which lease was modified by agreement, *635 under the seals of the parties, in 1870. This instrument, so modified, contained numerous covenants, among others an agreement by the party of the second part to pay to the stockholders of the party of the first part certain dividends, and by the instrument the continued existence and organization of the Dayton and Michigan Railroad Company is contemplated. The lease contains this clause :
“ In case said party .of the second part, its successors or assigns, shall at any time hereafter fail to pay said dividends to the stockholders of said party of the first part, as hereinbefore provided for, or shall fail to keep and perform any of the other covenants and agreements in said lease (as hereby modified) contained, • on its part to be kept and performed, and shall continue in such default for the period of ninety days, then, and in every such case, it shall be lawful for the party of the first part, its successors and assigns, at its or their option, without demand, to enter into and upon said demised premises and remove all persons therefrom; and from thenceforth the said demised premises and all additions and improvements which shall or may have been made to the same, shall be held by the party of the first part, as of its first and former estate; and upon such entry for non-payment of rent, or breach or nonperformance of any agreement or covenant, all estate of said party of the second part in said demised premises, and the additions thereto, shall cease and determine, and the party of the second part hereby covenants and agrees upon the determination of said lease for the causes aforesaid, to surrender and deliver up to the party of the first part, its successors or assigns, the said demised premises, including rolling stock, equipment, machinery, and tools, equal to that now on said premises, in as good order and condition as the same may be at this time in, together with all additions and improvements that may be made thereto.”
The agreed statement of facts contains the following; “ Said Dayton and Michigan Railroad Company has, ever since said indenture as before it, maintained and kept up its organization as a corporate' body by regular elections of directors and officers, keeping a business office, and in all things conforming *636 to the provisions of its charter and the laws of the state as a railroad company.”
Burden and passenger trains pass regularly over these roads (the Cincinnati, Hamilton and Dayton Railroad and the Dayton and Michigan Railroad), without break or interruption, from Cincinnati to Toledo, a distance of two hundred miles.
. The Cincinnati, Hamilton and Dayton Railroad Company also controls and ojaorates the following lines of railroad under leases, that is, the Cincinnati, Richmond and Chicago Railway, extending from Hamilton to Richmond, Indiana, and the Cincinnati, Hamilton and Indianapolis Railway, extending from Hamilton to Indianapolis.
At Dayton cars may pass from the lines so under the control and management of the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company to the lines so under the control and management of the Cincinnati, Hamilton and Dayton Railroad Company, and vice versa. The hiatus at that place between the northern terminus of the Cincinnati and Springfield Railway and the southern terminus of the Cincinnati, Sandusky and Cleveland Railroad, supplied by arrangement with and used in common by all the railroads at that place, as already stated, consists of two tracks, and all cars going in one direction pass over one of the tracks, and all cars going in the other direction pass over the other track.
At Sidney -the track of the Dayton and Michigan Railroad, so operated by the Cincinnati, Hamilton and Dayton Railroad Company, crosses the line of the Cleveland, Columbus, Cincinnati and Indianapolis Railway, leading from Glalion to Indianapolis, eighteen feet above the track of the latter road, and the two roads are connected at that place by a side track six hundred feet in length, by using which cars may pass from one road to the other.
1. If we regard the instrument by which the Cleveland, Columbus, - Cincinnati and Indianapolis Railway Company acquired the right to operate and control the Cincinnati, San-dusky and Springfield Railroad between Springfield and Dayton, and the Cincinnati and Springfield Railroad between Cincinnati and Dayton, as a permanent lease, we state the case as *637 favorably for the defendants as the law and the fact will warrant ; and the same thing is true with respect to the instrument under which the Cincinnati, Hamilton and Dayton Railroad Company operates and controls the Dayton and Michigan Railroad. Ve recur then to the question whether lines held by leases are within the terms of section 3379. In order to determine that question, it is proper to consider all the legislation upon the subject.
The Cleveland, Columbus, Cincinnati and Indianapolis Railway Company and the Cincinnati, Hamilton and Dayton Railroad Company were each subject to all the restrictions and conditions prescribed in the act of 1848, “regulating railroad companies ” (2 Curwen, 1394), and the amendments thereto, and are subject to the restrictions and conditions of all general laws of the state relating to railroads and railroad companies. The act of 1848 provided, by section two, as follows: “Said corpoi’ation shall be authorized to construct and maintain a railroad, with a single or double track, with such side tracks, turn-outs, offices, and depots as they may deem necessary, between the points named in the special act incorporating the same, commencing at or within, and extending to or into any town, city, or village named as the place of beginning or terminus of such road, and construct branches from the main line to other towns or places within the limits of any county through which said road may pass.”
Previous to 1851 special provision was made in the charters of certain railroad companies for consolidation with other specified companies, but there was no general law upon the subject. The act of 1851, “relating to railroad companies” (2 Curwen, 1056), provided as follows: “Whenever the lines of railroad of any railroad companies in this state, or any portion of such lines, have been or may be constructed so as to admit the passage of burden or passenger cars over any two or more of such roads continuously, without break or interruption, such companies are hereby authorized to consolidate themselves into a single corporation.” This evidently is to be understood as referring to the line of each road, but the word is made plural in form, for the reason that the two companies are re *638 ferred to in the same form. And. it was required, furthermore, by that act, that the agreement between the dix-ectoi’s of the consolidating companies should specify, among other things, “ the manner of converting the shares of capital stock, in each of said two or more corporations, into shares in such new corporation (and) the manner of compensating stockholders, in each of said two or more corporations, who refuse to convert their stock into the stock of such new corporation..... Provided, that all stockholders, in either of such corporations, who shall refuse to convert their stock into the stock of such new corporation, shall be paid at least par value for each of the shares so held by them, if they shall so require, previous to the consolidation being'consummated.” And it was further provided, in effect that when such consolidation was effected, the consolidating companies should cease to exist, and “ all and singular their rights and interests, in and to every species of property, real, personal, and mixed, and things in action, shall [should] be deemed to be transferred to and vested in such new corporation, without any other deed or transfer.”
Apart from the provision relating to consolidation, and wholly independent of it, the same act provided that any railroad company organized in pursuance of law might lease any part or all of any railroad constructed by any other company, if the lines of such lessor and lessee were continuous or connected, “ upon such terms as may [might] be agreed on between said companies respectively.” This was the first general provision on the subject.
By force of such lease, the right to the use of the road passed from the lessor to the lessee, according to such terms and conditions with x-espect to the use as are proper in a lease; but nothing else passed. “The lessee is the assignee for a term or pexdod of the lessor-—his bailiff, to hold possession for him.” Penn. R. Co. v. Sly, 65 Pa. St. 205. The power to lease does not imply a power to consolidate, nor does the power to consolidate imply a power to lease, but these powers ax-e distinct and independent. This was true under the earliest legislation on the subject, and it is true under the present legislation. While, in case of consolidation, the x-ights of the lessee pass to the new company, nothing else ¡xasses; arxd the lessor retains, unimpaired, *639 its corporate existence, powers and privileges, except as affected by the agreement for such use; and hence, among the powers so retained by the lessor, is the power of consolidation.. Clearly, in our opinion, there can be no consolidation unless the companies whose lines form the connection are consolidated. But here it is ¡Jain that the connection is formed and only exists by the lines of the lessors, and that as to the lessor companies there is no consolidation. Evidently this is in accordance with the view of the statute taken by the parties when the lease to the Cleveland, Columbus, Cincinnati, and Indianapolis Railway was executed, as will appear from the extracts from that instrument already set forth. Moreover, the statute, which makes ample provision for the protection of stockholders of the consolidating companies, makes none for the protection of stockholders of the lessor companies. Plainly, as it seems to us, there is no consolidation of the lessor companies; and it is equally clear that the right to consolidate, based on the consolidating companies’ ownership of the leased roads, is wholly untenable. True, under the former as under the present statute, the power to consolidate may, in general, have been in abeyance in the lessor company; but it was the lessor’s voluntary act, if its power in this respect was suspended; and it is equally true that upon the termination of the lease for any cause, the power to consolidate would revive with all its force.
Suggestion is made that the danger of defeating the consolidation by non-payment of rent, or the like, and consequent forfeiture of the lease, is not greater than the danger arising from the foreclosure of a mortgage, which practically might have the same effect as such forfeiture. If we admit this to be true, it does not militate against the construction we have given to the statute. The real question is as to the meaning of the words of the statute, “lines of road.” A mortgage, being clothed with the legal title, may, after condition broken, recover and hold possession, though in Harkrader v. Leiby (4 Ohio St. 602, 612), the judge delivering the opinion properly said that “ a mortgage is now treated in both courts (law and equity) as a mere security for the debt, and the mortgagee is permitted to nse the legal title only for the purpose of making effectual such security.” But the title of a lessee is very different and *640 the road so leased to it is not its line of road, in. the sense of the statute, but the road of the lessor company. Indeed, if we are permitted to depart from the plain words of the statute, and determine that where the control of a railroad by another company is permanent in its character, such ownership is sufficient to satisfy the requirement, it is difficult to see why a company having no other than leased lines, or one having a permanent running arrangement with another, may not come within the provision. I am fully persuaded that nothing of the sort was contemplated by the legislature.
I have so far spoken in the main of the proper construction of the acts of 1848 and 1851. But, although certain changes have been introduced into the subsequent acts (3 Curwen, 1882, 1884; 3 Sayler, 1760, 1872; 4 Sayler, 2950; Rev. Stats, §§ 3300, 3379), there is nothing in any of them leading to an]' other conclusion in this respect than the one stated. Indeed, it is a well settled principle that wlxex’e a statute has undergone revision, it should be construed as before, unless the new ad plainly requix-es a change in the construction. Applicatior > has been given to this principle in cases where the change was very marked. Williams v. The State, 35 Ohio St. 174. And it is also a well settled rule that, it being of the very essence of a law that it be uniform and unchangeable, whatever was the meaning of a statute when first enacted, shoxxld be its meaning through all future time. Reed v. Evans, 17 Ohio, 128, 134. This, of course, is to be taken with the qualification that such statute, though unchanged in its language, may be modified or eoixtrolled in its operation by a subsequent statute. Slater v. Game, 3 Ohio St. 80. But there is nothing in the present statutes requiring any different construction, in the particular under consideration, than should have been placed on the former acts.
In bolding that lines held by lease áre not within the provisions as to consolidation found in section 3379, we give expression to that which seems to be the plain construction of our statute. This position, in my opinion, is impregnable. But if we regarded the question as doubtful, the result should be the saxne; for it is a principle perfectly well settled, that where *641 a statute granting corporate power admits of two probable but conflicting constructions, that construction should be given to .it which is least favorable to the existence of the power. In no case is this principle more distinctly asserted than in Straus v. Eagle Ins. Co., 5 Ohio St. 59.
We are told that other consolidations, based on such leased lines, have been made, and that the secretary of state has received and filed the certificates of such consolidations, and furnished copies thereof. No doubt the practical construction which a statute has received in the.executive department of the government, may in some cases aid in its construction. Work v. Corrington, 34 Ohio St. 64, 75. But we are not advised that there has been such uniform usage in that particular as to afford aid in the interpretation of this statute, much less control its construction.
2. But there is another view of this case to which I assent, and that view leads to the same result. It is in respect to the situation of these roads, and the relation they bear to each other, without special reference to the title by which they are held ; and this presents a question of mixed law and fact. It is admitted in the agreed statement, “that for many years last past, a very large commerce has existed between the portions of the United States lying southerly, south-easterly, and southwesterly of Cincinnati, on the one hand, and the regions conveniently reached by the commerce of Lake Erie, and of the great lakes connected therewith, on the other hand. That the course of this commerce has been such that goods, wares, and merchandise in large amounts have been brought to the city of Cincinnati by the transportation lines upon the Ohio river, and by the railroad lines converging at Cincinnati, and the same has been transported by the railroads running through the state of Ohio to points upon Lake Erie, and thence transported by the way of the lakes, and the railroads running from cities upon the lakes, to the Atlantic seaboard and the northwestern states. That owing to the great competition existing between the transportation lines upon Lake Erie, the rates of transportation of merchandise from either Cleveland, San-dusky, or Toledo to points upon the said great lakes, except *642 Lake Erie, either easterly or westerly, from the said cities, have been generally the same to any one of such points, notwithstanding the difference as to distance in favor of either of the said cities; so that merchandise going from either of said cities through the said lakes, and destined to any point, either upon the Atlantic seaboard or in the north-western states, or any intermediate point east of and including Buffalo, generally paid the same rates for transportation upon the lakes, whether they were shipped from either Cleveland, Sandusky, or Toledo. That previous to the 8th day of July, 1881, there was an active competition between the aforesaid Cleveland, Columbus, Cincinnati and Indianapolis Railway Company and the aforesaid Cincinnati, Hamilton and Dayton Railroad Company in respect to the said transportation business from Cincinnati to points upon Lake Erie, and great rivalry existed as to the obtaining and conducting of -such transportation business. That the said railroad companies respectively connected the said (Sty of Cincinnati with the ports of Cleveland and Toledo on Lake Erie.”
The Cleveland, Columbus, Cincinnati and Indianapolis Railway and the Cincinnati, Hamilton and Dayton Railroad, with their leased lines, constitute two great arteries of trade, both commencing on the Ohio river at Cincinnati, meeting at Dayton, and extending thence to Lake Erie, one terminating at Cleveland and the other at Toledo. The attorney-general says, and the record supports the statement, that these roads are “ for sixty miles lying parallel and near to each other.” That they are, indeed, in the largest sense, parallel and competing roads, seems to be beyond dispute, and it may be fairly inferred from the record that a leading object in making tire consolidation was to destroy that competition. That being true, the lines of these roads are not, in my judgment, “ so constructed as to admit the passage of burden or passenger cars over two <©r more of such roads contmuousk/,” within the proper meaning of section 8379. That the mere physical ability to pass cars from one road to the other satisfies the statute, is a.construction of it which is wholly inadmissible, for the provision requiring such connection would be without *643 meaning. In imposing that restriction upon consolidation, the legislature intended, not merely that the physical fact should exist, but that such consolidation should only be made for the very purpose of passing freight and passengers over both lines, or some material parts thereof, not necessarily in a direct or straight line, but continuously.
Counsel for the defendants insist that in construing statutes, regard must be had to the words. No doubt that is true ; but it does not follow that regard is to be had to nothing else. Mr. Bishop says that courts “ do not close their eyes to what they know of the history of the country and of the law, of the condition of the law at a particular time, of the public necessities felt, and other like things.” Bishop’s Stat. Or. § 77. In Logan v. Courtown, 13 Beav. 22, 29, it was said that in construing a statute, regard must be had to “ the words in which it is expressed, applied to the facts existing at the time.” In Brewer v. Blougher (14 Pet. 178, 198), Taney, C. J., said: “ It is undoubtedly the duty of the court to ascertain the meaning of the legislature from the words used in the statute, and the subject-matter to which it relates; and to restrain its operation within narrower limits than its words import, if the court are satisfied that the litoral meaning of its language would extend to cases which the legislature never designed to embrace in it.” And see Cooley’s Con. L. (4th ed.) 79; Maxwell on Stats. 16-25.
Having regard to the language of this statute, in the light of such aids as are here indicated, I am satisfied the legislature never intended that railroads situated as these are should be regarded as constructed for the carriage of freight and passengers continuously, in the manner contemplated by the section. Indeed, each of these consolidating companies had a line for the carriage of freight and passengers from Cincinnati to Lake Erie, “ continuously, without break or interruption,” and the policy of the country in general, indicated in constitutional and statutory provisions, has long been opposed to the consolidation of roads bearing such relation to each other, and this strengthens the belief that these companies are not within the section in qirestion. Consolidation for the transportation of freight and passengers continuously, is a thing which the *644 legislature might well desire to encourage, as it may be advantageous alike to the public and the companies ; but corporations have power only as granted by the general assembly; and where companies situated as these are, being parallel and competing, claim that authority to consolidate has been granted to them, they must be able to point to words in the statute which admit of no other reasonable construction, for.it will not be assumed that the law-making power has authorized the creation of a monopoly so detrimental to the public interest. But the statute contains no such words.
An examination of the provisions relating to the power of railroad companies to lease, does not lead us to a different conclusion. True, by the act of 1851, it was not provided in express words that the fact that the lines of two eompan es wore parallel and competing should be a bar to a lease by one to the other or to a consolidation of the companies ; nor was there any such express provision in the act of 1852 (3 Curwen, 1884), or the act of 1869 (3 Sayler, 1760), with respect to leasing. Express provision, however, prohibiting one company from leasing to another where their lines were competing, was made by the act of 1873 (4 Sayler, 2950), and that provision was carried into the Rev. Stats. § 3300. From the absence of any such express prohibition with respect to consolidation, it is argued that here is a legislative expression that the fact that lines are competing is no objection to consolidation. But that conclusion, in my judgment, is altogether erroneous. By the act of 1852 (3 Curwen, 1877), consolidation was provided for in section 21, and leasing in section 24. When section 24 was repealed and re-enacted with certain changes in 1869, it was left, in the respect mentioned, unchanged, and such prohibition was introduced, as we have seen, in 1873, when the section was again amended. Perhaps this latter amendment wTas introduced by reason of some abuse which had no direct relation to consolidation, and hence the propriety of amending the section on that subject was not considered. But, however this may be, it does not follow that such change in the language of the act worked any radical change in the law. The presumption, as we have seen, is the other way, where the purpose to *645 require a cliauge in the construction is not clear. Notwithstanding the act of 1873, the question still is as to the fair interpretation of the section relating to consolidation previous to that time, which section is still in force in substantially the same form. Rev. Stats. § 3379. .That it does not authorize a consolidation of lines bearing to each other the relation borne by these roads, is a proposition to which I fully assent.
Entertaining these views, tire question how far this consolidation may be affected by-the clause in the act of 1873, incorporated into section 3300 of the Revised Statutes, is not with me a vital one. But the policy of the state, as declared in that enactment, cannot be in doubt. Since 1873, at least, there can be no lease where the lines of the lessor and lessee are competing, and it is admitted that if there can be no lease, there can be no consolidation of such lines leased since then. The rule upon the subject may be more rigid since 1873 than it was under the former legislation. I do not think it is necessary to determine how that was, nor is it necessary to express any further opinion upon the question how far section 3300 might be regarded in determining this cause.
3. A fatal defect in the organization of this company is found in the fact that under Rev. Stats. § 3381, the directors of the consolidating companies must set forth in their joint agreement the places of residence of the new directors, as well as their number. This provision of the statute has not been complied with. There is no designation of any such place of residence. We are not to speculate as to the propriety of this provision, nor as to. the manner it became incorporated into the statutes in its present form. It is sufficient to say the provision is in no sense directory, and that a compliance with it is indispensable. Atlantic, &c., R. Co. v. Sullivant, 5 Ohio St. 276 ; The State v. Lee, 21 Ohio St. 662; Raccoon, &c., Co. v. Eagle, The State v. Cen. O. Association, 29 Ohio St. 238, 399; People v. Chambers, 42 California, 201.
The discussion by counsel has taken a wide range, and many additional reasons have been suggested in support Of the views here stated; but let what is written suffice.

Judgment of ouster.

*646 White and McIlvaine, JJ., concur in the judgment on the grounds stated in the first proposition. As to the second, as applied to the case, they express no opinion. They also concur in the third proposition.
Johnson and Longworth, JJ., concur in the judgment, on the grounds stated in the second and third propositions, but do not concur in the first. They prepared the following separate opinions:
Johnson, J.
In my opinion, section 3379 of the Revised Statutes should be construed so as to hold:
1. A railroad company, having the exclusive right to manage, control, and operate a line of railroad in perpetuity, whether such right is acquired by having constructed, purchased, or permanently leased the same or part thereof, may consolidate the same with another line when the two lines are so constructed as to admit the passage of burden or passenger cars over both of said lines, continuously, without break of in terruption.
2. But if such lines are, in their general features, parallel and competing, they are not corvbmuous within the true intent and meaning of section 3379 of the Revised Statutes, and hence cannot be consolidated.
The facts of this case show that the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company owned a line of railroad from Cleveland to Springfield, and had acquired by contracts or leases, the right, in perpetuity, to manage and operate a railroad from Springfield, via Dayton, to Cincinnati. The line thus acquired was an extension of the line it owned, and the two together constituted one continuous line from Cleveland to Cincinnati, and was in legal effect an extension of the Cleveland, Columbus, Cincinnati and Indianapolis Railroad.
The Cincinnati, Hamilton and Dayton Railroad owned a lino from Cincinnati to Dayton, and had, by contract, acquired a like right to the railroad from Dayton to Toledo. This constituted a continuous line, under the perpetual management *647 and control of the Cincinnati, Hamilton and Dayton Company from Cincinnati to Toledo, and in legal effect was an extension of the line of the Cincinnati, Hamilton and Dayton road to Toledo. Each new line had for its terminus on the Ohio river the city of Cincinnati, and on Lake Erie one had Cleveland, the other Toledo. At the southern terminus, and to Dayton, they were parallel, and competing for all freight and passengers to Lake Erie. At Toledo and Cleveland they were competitors for business to Dayton and Cincinnati. Neither of these lines is, as to the other, a continuing line. By a consolidation they do not constitute one continuous line, but two parallel and competing lines.
If these lines can be consolidated, the new or consolidated company does not then have one continuous line, but two lines, parallel in their general features, neither of which, as the other, is a continuous line, nor is either as to the other ««c* extension.
The intent of this section of the statute is, to authorize a consolidation when the lines are so constructed as to admit the passage of burden or passenger cars over two or more of them continuously, i. e., the two lines so consolidated will, each as to the other, be an extension, - and provide for continuous transit under a single management and control, thus affording to the public greater facilities for travel and business, “ without bréale or interruption,” and greater unity and economy of management. Continuity of transit and efficiency, responsibility and economy in the transaction of business, under a singk, management, are the objects to be accomplished. Consolidation, which thus promotes the convenience of the public, is for the public benefit and is authorized, while that which does not provide for continuity of transit without break or interruption, but combines parallel and competing lines, creates a monopoly, which is against the public policy of the state.
The statute is addressed to corporations having the capacity to accomplish the main object, the continuous transit, without break or interruption.
The lessor company of a given line has neither capacity nor power to do this. It has, by a lease or contract of a permanent *648 nature, divested itself of any power to furnish such transportation.
The franchise to maintain and operate a railroad over the leased line passed, with the tangible property, to the lessee company. It alone can furnish the desired transportation.
The franchise or power to consolidate must exist in the corporation having such lines as may be united, so as to furnish that continuity of transportation which it was the purpose of the statute to provide for. A lessor company could not do this. A lessee company, having absolute control, during the life of the lessor company, can fully accoinplish this object, and I see no reason why it may not consolidate when this continuity of transit will be provided, which was the primary object of the statute.