## *In re* LEONG YICK DEW.

*(Circuit Court, D. California.    February 25, 1884.)*

CHINESE IMMIGRATION — RESTRICTION ACT — CERTIFICATE OF PREVIOUS RESI-
    DENCE—WHEN EXCLUSIVE EVIDENCE.
    The act of May 6, 1882, restricting Chinese immigration permits all laborers
    who were in this country at any time before the expiration of 90 days after the
    passage of the act, and who shall produce the certificate provided for by the

act, to go and come at pleasure, and no evidence of previous residence, except the prescribed certificate, can be received from those laborers who quitted the country since the certificates were obtainable; but those who went away before the act was passed, or before certificates were to be had, must be allowed (as was held in the *Case of Chin A On,* 18 FED. REP. 506) to prove their previous residence by any competent evidence.

Application for a Writ of *Habeas Corpus.* The opinion states the facts.

*T. D. Riordan,* for petitioner.

*S. G. Hilborn,* U. S. Atty., for the Government.

Before SAWYER, HOFFMAN, and SABIN, JJ.

SAWYER, J. The petitioner, a Chinese laborer, who was residing in the United States on the seventeenth day of November, 1880, left San Francisco for China, by steamer, on June 16, 1882, without obtaining the certificate provided for in section 4 of the act of congress of May 6, 1882, commonly called the restriction act. He has now returned and he seeks to land without such certificate, upon other proof of his residence in the United States at the date of the conclusion of the late treaty with China than the certificate provided in said section 4 of the restriction act. The question is whether he is entitled to land upon other satisfactory proof of former residence, without having obtained and produced such certificate. The treaty with China authorized the government of the United States to "regulate, limit, or suspend" the coming of "Chinese laborers" to, or residence in, the United States. But it provided that "the limitation or suspension *shall be reasonable,* and shall apply *only to Chinese who may go to the United States as laborers, other classes not being included in the limitation."* And it was further expressly provided that "legislation taken in regard to *Chinese laborers will be of such character only as is necessary to enforce the regulation, limitation, or suspension"* of immigration. It is still further provided that *"Chinese laborers* who are *now in the United States* [at the date of the treaty, November 17, 1880] *shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions* which are accorded to the citizens and subjects of the most favored nation." This treaty having been ratified by the contracting parties, congress, on May 6, 1882, passed "An act to execute certain treaty stipulations relating to Chinese," commonly called the restriction act, under which the questions at issue now arise. As it is not stated in the act when it should go into operation, we have no doubt that it took effect immediately upon its approval by the president.

Section 1 of the act provides—

"That from and after the expiration of ninety days next after the passage of this act * * * the coming of *Chinese laborers* to the United States be and the same is hereby suspended; and during such suspension it shall not be lawful for any Chinese laborer to come, or having so come, after the expiration of said ninety days, to remain in the United States."

Section 2 provides—

"That the master of any vessel who shall knowingly bring within the United States on such vessel or land, or *permit to be landed*, any Chinese laborer from any foreign port or place shall be deemed guilty of a misdemeanor, and shall be punished by fine of not more than five hundred dollars for *each and every such Chinese laborer* so brought," etc.

It will be observed that the language of the provisions of these two sections is broad, comprehensive, and sweeping, and that it in express terms prohibits "any" and "each and every" Chinese laborer from coming, or being brought into, or landed, or permitted to be landed in the United States or having come to remain, and, standing alone, would exclude each and every Chinese laborer, whether he had been in the country before or not. It would, be difficult to express that idea more explicitly. But section 3 puts a limitation upon the comprehensive language of the two preceding sections, and makes an exception in the following terms:

"The two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, eighteen hundred and eighty, or who shall have come into the same before the expiration of ninety days after the passage of this act, *and who shall produce to such master before going on board such vessel, and shall produce to the collector of the port in the United States at which such vessel shall arrive, the evidence hereinafter in this act required, of his being one of the laborers in this section mentioned.*"

Thus the exceptions are not Chinese laborers who were merely in the United States on the day mentioned, but Chinese laborers who were not only in the United States on that day, but who, in addition, "shall produce to such master before going on board such vessel, and shall produce to the collector of the port in the United States at which such vessel shall arrive, *the evidence hereinafter in this act required, of his being one of the laborers in this section mentioned.*"

Such is the plain language of the act defining the exceptions; and we are not authorized to enlarge the exceptions thus plainly defined by any latitudinarian or unwarranted construction. We cannot take half of the definition of the exception and reject the other half. We must take it as we find it, and that requires the certificate *as evidence of* residence as *well as the residence.* It seems clear to us that congress, with reference to Chinese laborers leaving the country, and having an opportunity to obtain the requisite certificate, intended to prescribe the evidence upon which they should be permitted to re-enter the United States, and that the evidence prescribed is a limitation upon, and forms a part of, the definition of the exceptions intended to be made to the comprehensive language of the preceding section of the act. And that evidence is the certificate to be furnished to the laborers departing from the county by the collector, or his deputy, of the port whence he takes his departure, provided for in the next section, being section 4 of the act. This, we think, is the only evidence of prior residence and a right to return of a departing laborer contemplated by the act of congress. The sweeping language of sections

1 and 2 quoted, it will be seen, are not permissive in form, but expressly prohibitory, and excludes, in unmistakable terms, each and every Chinese laborer, and but for the exceptions, also explicitly defined in the next section, none of that class could be admitted. None but those coming within the plain meaning of the language of the exception can be taken out of the excluding provisions. There is no other provision in the act to indicate a different policy, or that congress did not intend to make the required certificate the only evidence of a right to return, as to all those Chinese laborers, who, having a right to the certificate and the ability to obtain it, depart from the country without obtaining it. On the contrary, the only other sections affording any inference or light on this point are section 5, pointing out the mode in which the same class of persons desiring to depart *by land* shall procure similar certificates; and section 12, which provides "that *no Chinese person* shall be permitted to enter the United States by land without producing to the officer of customs the certificate in this act required of Chinese persons seeking to land from a vessel." This provision is, positively, prohibitory also, and not permissive; and it particularly and expressly forbids an entry without the particular evidence prescribed by this act. There could scarcely have been intended one rule of evidence for those entering by land and another for those landed from vessels. We think, then, that the certificate provided for is the only evidence of the right to re-enter the United States, or having re-entered, to remain, of a Chinese laborer who has departed from the United States, having the opportunity afforded by the act to obtain the certificate required, whether he comes by land or by sea.

We do not wish to be understood as questioning the construction adopted by the district court, in the *Case of Chin A On*, 18 FED. REP. 506, in regard to those Chinese laborers who were living in the United States at the date of the conclusion of the treaty, November 17, 1880, or subsequently, and who left the United States prior to May 6, 1882, the date of the passage of the restriction act. On the contrary, we are fully satisfied of the propriety of the construction given in that case. Congress could not possibly have intended to require that class of Chinese laborers to procure the required certificate where it was a physical impossibility for them to obtain it; and it would be absurd, under the circumstances, to hold that congress intended to, arbitrarily, exclude that class in direct violation of the express terms of the treaty protecting them. Congress had declined to enact any such legislation as is contained in the restriction act while the Burlingame treaty was in force, for the reason that it would be an act of bad faith on the part of the United States towards China, and a direct violation of the solemn stipulation of the treaty between the two governments. The United States went to the trouble, expense, and delay of sending a special mission, composed of three distinguished gentlemen, to China, for the express purpose of procuring

a modification of the Burlingame treaty, in order to enable the United States to adopt the legislation now in question without committing an act of bad faith towards China, and without violating the treaty stipulations between the two nations. A treaty was made with the modifications sought, which was ratified by, and apparently satisfactory to, both nations. And the modified treaty, in express and the most explicit terms, protected the class in question in their right to remain in the United States, or "to go and come of their own free will and accord," and also provided that they "shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation."

It is expressly stipulated in the supplementary treaty that the "legislation taken in regard to Chinese laborers will be of such character *only as is necessary* to enforce the regulation, limitation, or suspension of immigration," and that "the limitation or suspension shall be reasonable." Conceding the legislation requiring Chinese laborers departing from the United States after the passage of the act in question, and having an opportunity to do so, to procure and produce the required certificate to be "necessary" and "reasonable," still such a requirement as to those who departed after the date of the treaty, and before the passage of the act, or before it was practicable or possible to obtain the certificate, could neither be necessary nor reasonable. If congress, then, intended by this act to make this provision requiring the prescribed certificates applicable to those Chinese laborers who were in the United States at the date of the treaty, and who left before the passage of the act of May 6, 1882,—before it was possible to obtain the certificate,—then it was the deliberate intention of congress to act in bad faith towards the government of China, and to violate the solemn obligations of the very treaty it had taken so great pains to obtain, in order to enable it to honorably legislate at all upon the subject. Why take all this trouble to negotiate a treaty if it was intended at last to flatly disregard it, and legislate in direct violation of its most solemn and vital stipulations? Congress might, with just as much propriety, have ignored and disregarded the Burlingame as the supplemental treaty. There would be just as much propriety in wholly repudiating the treaty as to repudiate it in this vital part, which the Chinese government took care to have inserted. It would be to the last degree absurd, under the circumstances, to suppose for a moment that congress intended to make the provisions of sections 3 and 4, relating to certificates, applicable to the class of Chinese laborers referred to. We cannot attribute to congress a deliberate intention to commit any such act of bad faith without provisions manifesting such a purpose far more explicit than any found in the act.

Again, the same section which requires the certificate gives to the departing Chinese laborer an absolute, indefeasible right, without cost or expense, to have the certificate, in order that he may be able to produce it as evidence of his right to re-enter the United States.

The necessity to produce it, and the right to have it, in order that he may produce it, are correlative conditions. The one provision is the complement of the other. They are reciprocal, and must go together. The obligation to produce the certificate presupposes the practicability, or, at least, the possibility, of procuring it, in order that it may be produced. The two provisions go together, and form but one legal conception. The obligation to produce and the right and ability to obtain it are *dependent,* and *not independent,* conditions. One is the counterpart of the other, and it is not to be supposed that congress would have adopted one branch of the proposition without the other, otherwise it would have distinctly done so in terms. If, then, it is impossible to comply with the condition, the impossible condition must be regarded as not intended as to this class of laborers; or if intended, it must be void. The law requires nothing impossible— *Lex non cogit ad impossibilia,* (Bouv. Law Dict. "Maxims;" Broom, Max. 242;) and *Lex non intendit aliquid impossibile,* (Bouv. Law Dict.) —the law intends not anything impossible—are among the most venerable maxims of the law. In a statute, "No text imposing obligations is understood to demand impossible things." Sedg. St. Law, 191. "Provisions in acts of parliament are to be expounded according to the ordinary sense of the words, unless such construction would lead to some unreasonable result, or be inconsistent with, or contrary to, the declared or implied intention of the framer of the law, in which case the grammatical sense of the words may be modified, restricted, or extended to meet the plain policy and provision of the act." Dwarris' St. 582. The rule is to construe words "in their ordinary sense, unless it would lead to *absurdity or manifest injustice;* and if it should so vary them as to avoid that which certainly could not have been the intention of the legislature, we must put a reasonable construction upon the words." Id. 587. See *Donaldson* v. *Wood,* 22 Wend. 399; *Lake Shore Ry. Co.* v. *Roach,* 80 N. Y. 339. "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to *injustice, oppression, or an absurd consequence.* It will always, therefore, be presumed that the *legislature intended exceptions to its language which would avoid results of this character.* The reason of the law in such cases should prevail over the letter." *U. S.* v. *Kirby,* 7 Wall. 486. "In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. * * * To require a heavy and almost impossible condition to the exercise of this right, with the alternative of payment of a small sum of money, is, in effect, to demand payment of that sum." *Henderson* v. *Mayor of New York,* 92 U. S. 268. See, also, *Lessee of Brewer* v. *Blougher,* 14 Pet. 198; *U. S.* v. *Freeman,* 3 How. 564. So, in the case of the class of Chinese laborers now under consideration, to require them to produce a certificate as the *only* evidence of their right to land, when it was impossible or impracticable to procure it, would be, in effect, to absolutely and un-

conditionally exclude them. Yet it is manifestly the policy, intent, and reason of the law to carry out in good faith the stipulations of the treaty that they "shall be *allowed to go and come of their own free will and accord*," and "*be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation.*"

We are therefore fully satisfied that those Chinese laborers who were in the United States on November 17, 1880, and left before the passage of the restriction act, and those also who came into the United States and departed therefrom between that date and May 6, 1882, and even afterwards, before the collector was prepared to issue the certificates provided for in section 4 of the restriction act, "in such form as the secretary of the treasury shall prescribe," are entitled to re-enter the United States upon satisfactory evidence other than the certificates provided for in said section 4.

The secretary of the treasury *first* issued his circular, notifying the various collectors of the ports of the United States of the passage and terms of the restriction act, and indicating the form of certificate to be used,—*which form, under the act, is to be prescribed by him alone,*—on May 19, 1882, and that circular was received at the port of San Francisco on May 26th, in time for the outgoing steamer for China, which sailed on June 6th. The secretary, however, did not send out his blanks, or authorize any to be printed by the collector, or furnish full instructions in time to arrive before August 4th, the date at which the right of Chinese laborers to enter the United States expired. They were in fact received at this port on August 8, 1882. The Chinese consul, on consultation with the officer in charge of the collector's office, had blank certificates printed, at his own expense, upon the same sheet with a certificate or passport issued by himself, which were issued by the collectors to outgoing Chinese laborers, and which, by direction of the secretary of the treasury, through telegraphic correspondence, were marked "Temporary." The first of these certificates was dated June 6th. From that time till August 8th these temporary certificates were issued, at first on the same sheet with the other issued by the Chinese consul, and afterwards separately. These certificates have been recognized by the collector when presented by returning Chinese laborers. Up to the date of the circular of the secretary of the treasury, received at San Francisco May 26th, the secretary had not prescribed the form of the certificate, and clearly the collector's office at San Francisco was not in a condition to execute the law according to its terms in time for any Chinese laborers departing prior to the sailing of the steamer which left on June 6th. We therefore hold that those Chinese laborers who departed from San Francisco prior to June 6th could not reasonably procure the prescribed certificate, and they must be admitted, on their return, on other satisfactory evidence of their having been in the United States between November 17, 1880, and

the date of their departure. On and after June 6th the collector was prepared to carry out the law according to its real intent, and all Chinese laborers departing from the port of San Francisco on and since that date, having had an opportunity to procure the required certificate, will be required to produce it.